**LOCAL 13, INTERNATIONAL FEDERATION OF PROFESSIONAL AND TECHNICAL ENGINEERS, AFL–CIO, Appellee,**

v.

**GENERAL ELECTRIC COMPANY, Appellant.**

**No. 75–1887.**

United States Court of Appeals, Third Circuit.

Argued Oct. 28, 1975.

Decided Feb. 18, 1976.

As Amended March 29, 1976.

Lewis H. Van Dusen, Jr., John Markle, Jr., Morris R. Brooke, Drinker, Biddle & Reath, Philadelphia, Pa., for appellant.

Bernard N. Katz, Bruce E. Endy, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for appellee.

Before BIGGS, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

This is an action brought by Local 13, International Federation of Professional and Technical Engineers, AFL–CIO (Local 13), a labor organization representing certain General Electric Company (GE) employees, seeking an injunction to restrain GE from transferring or otherwise removing certain disputed work to Burlington, Iowa, and to compel GE to submit the issue of the removal of work to binding arbitration. The United States District Court granted the motion of Local 13 for a preliminary injunction and GE has appealed. Jurisdiction is vested in this Court by virtue of 28 U.S.C. § 1292(a)(1).

### FACTS

#### 1. *The 1973–76 Agreement*

Local 13 represents approximately 229 draftsmen employed by GE at its switch-gear plant in Philadelphia. The members of the bargaining unit do both electrical and mechanical drafting. On April 17, 1975, GE notified Local 13 that it intended to transfer its drafting for one switch-gear product known as 5 KV Vertical Lift Equipment to its Burlington, Iowa, plant, and informed Local 13 that the work reassignment would force the layoff of 35 employees in the Philadelphia plant bargaining unit.

Local 13 immediately objected to the work transfers sought by GE and pursued the three stage grievance procedures authorized by a collective bargaining agreement of 1973–76.[1] Following the unsuccessful processing of its grievance or grievances, Local 13 invoked the arbitration provision of the collective bargaining agreement. GE refused arbitration of the issue, asserting that the management rights clause of the arbitration provisions relieved it of any obligation to arbitrate.[2]

Local 13 then brought this suit pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to compel

---

1. There are other bargaining agreements referred to hereinafter. We are concerned primarily with that of 1973–76.

2. The pertinent provisions of the 1973–76 collective bargaining agreement (Agreement) are attached as an Appendix.

arbitration and to enjoin GE from reassigning the drafting work from Philadelphia pending the completion of arbitration. The United States District Court found Local 13's grievance arbitrable under the collective bargaining agreement and restrained GE from transferring the work. GE filed a timely appeal to this Court.[3]

GE insists that the management rights clauses of the arbitration agreement of 1973–76 exclude from the duty to arbitrate disputes concerning the transfer of work outside the bargaining unit. The Local takes the position that the transfer of the bargaining unit work is not specifically excluded from the scope of the labor agreement's arbitration clause and, therefore, federal labor policy raises a presumption of arbitrability.

The agreement, "Arbitration" Article XI, provides that either party may submit to arbitration:

"1. Any grievance which remains unsettled after having been fully processed through the same grievance procedure pursuant to Article X which involves either:

"(a) The interpretation or application of a specific provision of this agreement or

"(b) A disciplinary penalty (including discharge) . . ."

Article XI. 3(a) provides: "The award of an arbitrator upon any grievance subject to arbitration as herein provided shall be final and binding upon all parties to this agreement provided that *no arbitrator shall have any authority* to add to, detract from, or in any way alter the provisions of this agreement or *determine the arbitrability of any issue.*"

Article XI. 3(b) provides: *"It is specifically agreed that matters relating to the management of the Company, including but not limited to the right to control*

*operations and the assignment of work, subcontracting of work, the establishment or modification of any wage, salary or job classifications, or the authority to decide the appropriate classification of any employee shall not be subject to arbitration. It is also agreed that the mere inclusion of the Recognition Article in this Agreement is not intended to be a matter subject to arbitration and that the arbitrator shall have no authority to interpret or apply this Article."*

Article XI. 4 says: "This Arbitration Article shall be construed according to the understanding of the parties that they do not intend that arbitration shall be a means of deciding all disputes which may arise between them during the term of this agreement and which they are unable to resolve through negotiation or by means of the grievance procedure, *but shall be construed instead to mean that there shall be subject to arbitration only those disputes which the parties have specifically and plainly agreed to arbitrate as provided above."*

Local 13 relies upon Article XI, emphasizing its language as follows: ". . . *Any grievance . . .* which involves (a) the interpretation or application of a specific provision of this agreement . . . *shall* be submitted to arbitration upon written request of either [party]` . . ."[4]

The local calls particular attention to the phrase "Any grievance" and takes the position that "it remains only to be seen whether the union grievance is specifically excluded by some other provision in the agreement." This statement will receive further consideration at a later point in this opinion. Local 13 also points out that GE's proposed transfer of bargaining unit work so as to cause the layoff of approximately one-fifth of the bargaining unit will have profound impact on the contract. It asserts: "This impact affects a variety of

---

**3.** On August 14, 1975, a panel of this Court granted GE's motion for an expedited hearing on the appeal pursuant to Section 10 of the Norris-LaGuardia Act, 29 U.S.C. § 110. The expedited appeal is that now at bar.

**4.** Emphases added to all the above quotations.

contractual provisions, especially those dealing with seniority, layoff and recall rights", citing specifically Article XIII, which provides in pertinent part, as follows: "1. (a) In all cases of layoff or transfer due to lack of work, total length of continuous service shall be the major factor determining the employees to be laid off or transferred (exclusive of upgrading). However, ability will be given consideration. (b) Similarly, in all cases of rehiring after layoff, such total length of continuous service shall be the major factor determining such rehiring." [5]

Article XII contains a no-strike provision which, *inter alia,* provides in paragraph one that the Union might strike within twelve months of completion of grievance Step III procedures, short of arbitration, upon proper notification of GE. Paragraph two reads: "2. The Company will not lock out any employee or transfer any job under dispute from the plant nor will the management take similar action while a disputed job is under discussion at any of the steps of the Grievance Procedure as set forth in Article X, or if the matter is submitted to arbitration as provided in Article XI."

### 2. *Extrinsic Evidence*

There is a "history" relevant to the intent of the parties in effecting the 1973–76 agreement. Whether it be admissible in the instant case is a question which is discussed hereinafter in note 13.

Briefly stated, that history is as follows: Exhibit "D–3, Exceprts [sic] from . . . GE–Local 13 . . . Agreement of 1960–63," sets out arbitration provisions, "Article XI–Arbitration", but does not include any language respecting "assignment of work." Exhibit "D–4 Excerpts from . . . GE–Local 13 . . . Agreement of 1963–66" does contain such a specific provision on arbitration and assignment of work *in haec verba* with that presently in the 1973–76 Agreement. Exhibit

"D–5, Excerpts from the 1966–69 GE–IUE (AFL–CIO) National Agreement," while including a provision, "Article XV–Arbitration" contains, as excerpted in the record, no similar provision relating to "assignment of work". In Exhibit "D–10" is an outline of union proposals for 1969 negotiations presented to GE, dated September 2, 1969. Included in this is a reference to "Article XI–Arbitartion [sic]" which states: "Revise entire article to provide for arbitration of all issues which have been exhausted at third step of the grievance procedure without mutual agreement. The Union to have choice of right to strike in lieu of arbitration."

Also included in the record is a pamphlet, Exhibit D–1, executed February 27, 1970, which contains printed copies of "General Electric-Local 13, AFTE (AFL–CIO) Agreement of 1970–73 and 1970 Wage Agreement . . . ." Under "Arbitration, Article XI. 3(b)," it states: *"It is specifically agreed that matters relating to the management of the Company, including but not limited to the right to control operations and the assignment of work, subcontracting of work, the establishment or modification of any wage, salary or job classification, or the authority to decide appropriate classification of any employee shall not be subject to arbitration . . . ."* [6] The preamble of the agreement states: "[A]ll prior agreements between the Company and the Union are cancelled and superceded."

Exhibit "D–7" is a letter written to the president of Local 13 by W. G. Angell, Manager of Hourly and Nonexempt Relations, dated February 11, 1970, the third paragraph of which states: "It is mutually agreed that any such grievance shall be the subject of expeditious treatment in the grievance procedure, and it is the mutual intent of the parties to complete the full grievance procedure covered in Article X, relative to any grievances covered in paragraph 2 above, within thirty (30) calendar days from the date of notification to the

---

**5.** Appellee's principal brief, at 14, 15.

**6.** Emphasis added.

Union by the Company that certain work and/or jobs will be transferred away from Philadelphia. In any event, the Company will not be obligated to withhold the effectuation of any such transfer of work and/or jobs for more than thirty (30) calendar days following notification to the Union of such transfer, except that, *in any case in which the parties agree to arbitrate* any such grievance the Company will, *but only if the parties mutually agree,* withhold transfer of the affected work or jobs until the arbitration decision shall have been received." [7]

### 3. Findings of Fact and Law by the District Court

The learned District Judge made the following specific findings of fact on the 1973–76 agreement, *inter alia:*

"16. From all the evidence presented, it appears to this court that GE has violated the discrimination clause of the collective bargaining agreement. That is, it appears that GE has violated Article III.

"17. From the evidence presented to this court, it also appears that GE has violated the seniority provisions of this Agreement. More specifically, GE has violated among others, Article XIII, Article IV and Article VII.

"18. Article XI of the collective bargaining agreement provides that a grievance which cannot be settled through the grievance procedure, which is allegedly in violation of Articles III, XIII, IV or VII, should be submitted to binding arbitration upon written request of either Local 13 or GE.

"19. There is no language in the collective bargaining agreement which specifically excludes referral of grievances arising out of a violation of any one of the above four Articles of the contract to binding arbitration."

The trial Judge stated: *"In conclusion, although GE has not agreed to arbitrate the assignment of work, they have agreed to arbitrate the seniority and discrimination clauses of the collective bargaining agreement.*[8] Therefore, when the assignment of work appears to be violative of these latter two provisions of the agreement, the provisions regarding the nonarbitrability of the assignment of work must succumb to the provisions against discrimination and the provisions concerning seniority."[9] This we believe to be the substance of his decision. He issued the injunction set out below.[10]

### LAW

■ In the light of his opinion and judgment, it is clear that the district court has left every issue open to arbitration. It would appear that the learned District Judge and the parties were not unmindful of the extrinsic evidence of intent.[11] Strictly speaking, the application of the decisions of this Court in *Ass'n of Westinghouse Sal. Emp. v. Westinghouse Corp.,* 283 F.2d 93 (1960) and *Communication Workers v. Bell Telephone Laboratories,* 349 F.2d 398 (1965), applying the extrinsic evidence to determine intent[12] need not be discussed because we believe that the agreement within its four corners was construed cor-

7. Emphasis added.

8. Emphasis added.

9. The court filed a lengthy opinion, unreported for publication.

10. "AND NOW, this 28th day of July, 1975, on the basis of the Findings of Fact, Discussion and Conclusions of Law which have been filed on this date, it is hereby ORDERED that:
    "1. Local 13 and General Electric submit the issue of the removal of bargaining unit work from Philadelphia to binding arbitration;

"2. GE shall refrain from removing the bargaining unit work in question from its Philadelphia plant until after a decision is rendered by the arbitrator;
"3. Local 13 shall post a bond in the amount of $500 as security for the injunction herein."

11. *See* Transcript of Hearing of July 22, 1975, at 7–8.

12. *See* "Facts 2. Extrinsic Evidence" *supra.*

rectly by the District Judge when he ruled that GE "has not agreed to arbitrate the assignment of work".[13] We determine, as a matter of law, however, that a fair inter-

13. Findings of Fact, Discussion and Conclusion of Law, July 28, 1975, p. 9. The Local insists that the phrase "assignment of work" means only assignment of work within the work unit and can relate only to the giving of work as distinguished from the taking away of work. We cannot accept these assertions.

Consideration of the extrinsic evidence, as well as the interpretation of the contract on its face, compels the conclusion that the position of Local 13 is without merit. We note considerable divergence of opinion among the circuits on the question of the use of extrinsic evidence to decide arbitration cases such as the one we have here. We need not decide whether extrinsic evidence is admissible, because the contract is explicit and unambiguous; there is no need to look to extrinsic evidence, even though some circuits apparently would allow its admission, despite an unambiguous document. *Independent Pet. Wrkrs. v. American Oil Co.,* 324 F.2d 903, 907 (7th Cir. 1963), aff'd., 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964); *Pacific Nw. Bell Tel. Co. v. Communication Wrkrs. of A.,* 310 F.2d 244, 246–47 (9th Cir. 1962) (relying on *American Mfg. Co., infra*). The Second Circuit requires that there be contradictory and non-frivolous interpretations of the contract before bargaining history can be admitted. *See, e. g., Strauss v. Silvercup,* 353 F.2d 555 (1965). For general discussion of the conflicting views of the circuits, see *Communication Wrkrs. of A. v. Southwestern Bell Tel. Co.,* 415 F.2d 35, 40 n.10 (5th Cir. 1969); *Communications Wrkrs. of A. v. Pacific Nw. Bell Tel. Co.,* 337 F.2d 455, 458 n.2 (9th Cir. 1964).

The Union relies upon this Court's *Westinghouse* and *Communications Workers* decisions, *supra,* to argue that extrinsic evidence is not admissible on the issue whether assignment of work is arbitrable. Judge Goodrich's opinion in *Westinghouse* was based chiefly upon Mr. Justice Whittaker's dissent in *Steelworkers of A. v. Warrior & Gulf Co.,* 363 U.S. 574, 585, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). We note, however, *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 567, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), where Mr. Justice Douglas for the Court said: "In our role of developing a meaningful body of law to govern the interpretation and enforcement of collective bargaining agreements, *we think special heed should be given to the context in which the collective bargaining agreements are negotiated and the purpose for which they are intended to serve.* See *Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 468, 80 S.Ct. 489, 4 L.Ed.2d 442 [(1960)]." In *Warrior,* 363 U.S. 574, 584, 80 S.Ct. 1347, 1354 (1960), Mr. Justice Douglas for the Court said: "A specific collective bargaining agreement may exclude contracting out from the grievance procedure. Or a written collateral agreement may make it clear that contracting out was not a matter of arbitration." (Emphasis supplied to preceding two quotations).

Judge Kalodner in *Communications Workers* implied that bargaining history extrinsic evidence is irrelevant when an "issue presented is, on its face, within the contractual agreement to arbitrate . . ." He did not treat the cases where there is a possible omission-of-expression or an ambiguity. The opinion finds its strongest support in *Westinghouse*; although it cited without specificity the *Steelworkers Trilogy, see* text *infra* and *American Mfg.* and *Warrior, supra.*

In light of the words of Mr. Justice Douglas, *supra,* and the affirmance in 1964 without opinion by the Court of *Independent Pet. Wrkrs., supra,* the position of this circuit on bargaining history extrinsic evidence may be appropriate for re-examination.

The strongest language we find in the *Trilogy* disfavoring the use of bargaining history implied its use, albeit with caution. "In the absence of any express provision excluding a particular grievance from arbitration, we think *only the most forceful evidence of a purpose* to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. Since any attempt by a court to infer such a purpose necessarily comprehends the merits, the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator." *Warrior, supra,* 363 at 584–5, 80 S.Ct. at 1354. (Emphasis supplied).

The most important and conclusive item of bargaining history is Exhibit D–7, the letter of February 11, 1970, see "Facts 2. Extrinsic Evidence," *supra,* which sets out the "mutual" interpretation of the parties to the bargaining agreement and demonstrates that GE had and has the right to transfer work away from Philadelphia upon thirty days' notice. We also refer to the previous agreements, particularly that of 1960–63 which does not include any language respecting the assignment of work, whereas the agreement of 1963–66 contains such a provision *in haec verba* with the 1973–76 agreement. The wording of the 1966–69 contract contains no such language.

Thus the work assignment issue has been the subject of careful and intensive bargaining by the parties. This extrinsic evidence supports the conclusion we have drawn from the 1973–76 contract itself that GE has retained the right to assign work.

pretation of arbitration Article XI. 1, 3(a), 3(b), 4;[14] the no-strike Article;[15] the discrimination Article:[16] and the Articles pertaining to seniority[17] cannot undo the explicit exclusion of assignment of work from arbitration. Indeed, it has been "specifically agreed"[18] that transfer of work shall be excluded from arbitration. If Local 13 is displeased by the transfer, it has the right to strike.[19] We cannot perceive how the application of the *Steelworkers Trilogy,* all of the identical date, June 20, 1960, *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403. *Steelworkers v. Warrior Gulf Co.,* 363 U.S. 574, 80 S.Ct. 1347, and *Steelworkers v. Enterprise Corp.,* 363 U.S. at 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424, or any case decided pursuant to these opinions can affect this result, for the right to transfer work was specifically agreed to and it is indubitably the law that the court must construe the contract. See *American Mfg. Co.* and in particular Mr. Justice Brennan's concurring opinion 363 U.S. at 569–70, 80 S.Ct. at 1364: ". . . the issue concerns the enforcement of but one promise— the promise to arbitrate in the context of an agreement dealing with a particular subject matter . . . Other promises contained in the collective bargaining agreement are beside the point, unless, by the very terms of the arbitration promise, they are made relevant to its interpretation.

14. *See* Appendix.

15. Article XII. 1, 2. *See* Appendix.

16. Article III.

17. Articles IV, VII, XIII. For Article XIII, *See* Appendix.

18. Article XI. 3(b) actually uses the phrase "specifically agreed". *See* Appendix.

19. *See* Article XII. 1 in Appendix.
We note the following language in *United Steelwrkrs. of A. v. NLRB,* 530 F.2d 266, 277 (3d Cir., filed Jan. 8, 1976):
"Here, however, the arbitration process was elective, not mandatory. The arbitration provision of the contract . . . was not coextensive with the no-strike clause. Arbitration could occur only upon written consent of both the union and the company. We are also mindful that '[n]o obligation to arbitrate a labor dispute arises solely by operation of law.' *Gateway [Gateway Coal Co. v. United Mine Workers of America]* . . . 414 U.S. [368] at 374, 94 S.Ct. [629] at 635 [38 L.Ed.2d 583]; see *Local 103, Electrical, Radio & Machine Workers v. RCA Corp.,* 516 F.2d 1336, 1339 (3d Cir. 1975). Accordingly, we agree that a *Boys Markets* [398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970)] injunction against the strike and requiring arbitration was unavailable to the company as a remedy."

And I emphasize this for the arbitration promise is itself a contract. The parties are free to make that promise as broad or as narrow as they wish. . . ."

In *Boeing Co. v. UAW,* 349 F.2d 412, 413 (1965), this Court in a *per curiam* opinion affirmed the district court's decision that the Boeing Company was not required to arbitrate the termination of its practice of distributing Christmas turkeys. We stated: "Judge Grim . . . after examining the arbitration clause and, in a clear and lucid opinion, held that the company was bound only to arbitrate grievances which involved 'the interpretation or application of provisions of this agreement . . .' and that 'Arbitration was limited to grievances involving a specific provision of this agreement. . . .' Further, the court pointed out that the exclusionary clause in the arbitration article stated that the 'jurisdiction of the arbitrator shall be limited to . . . the interpretation and application of the specific provision of this agreement at issue' and could only mean that it was intended to limit the scope of the arbitration matter.

"We are in agreement thereof and, accordingly, affirm the judgment of the court below."[20]

Ruling as we have we are not unmindful of the issues raised by Local 13 respecting

20. *See also, Halstead & Mitchell Co. v. United Steelwkrs. of A.,* 421 F.2d 1191, 1195 (3d Cir. 1969). In that case it is stated: " '[a] specific collective bargaining agreement may exclude contracting out from the grievance procedure. Or a written collateral agreement may make clear that contracting out was not a matter for arbitration. In such a case a grievance based

the grievance procedure as set out in Article X of the collective bargaining agreement, Articles III (dealing with discrimination based on union membership and the processing of cases to arbitration). IV (dealing with loss of work hours and overtime); V (dealing with wage rates and promotions); VII (dealing with service credits, *i. e.*, seniority); and XIII and XIV (concerning layoffs). We are not concerned with the arbitrability of these provisions. On this appeal we are solely concerned with the motion for preliminary injunction and the explicit provisions pertaining thereto.

## CONCLUSION

GE has demonstrated that it has the right to assign work by the specific terms of its contract with Local 13. Accordingly we will reverse the judgment and will remand with the direction to vacate the injunction.

## APPENDIX

### GE LOCAL 13 AGREEMENT 1973–1976

### ARTICLE XI

### ARBITRATION

1.  Any grievance which remains unsettled after having been fully processed through the grievance procedure pursuant to Article X which involves either:

(a) The interpretation or application of a specific provision of this agreement or

(b) A disciplinary penalty (including discharge) imposed for the violation of rules of conduct on or after the effective date of this agreement which is alleged to be imposed without just cause,

shall be submitted to arbitration upon written request of either the Union or Company provided such request is made within 90 days after final decision of the Company

has been given in writing to the Union. For the purpose of proceedings within the scope of (b) above, the standard to be applied by an arbitrator to cases involving disciplinary penalties (including discharge) is that such penalties shall be imposed only for just cause.

2.  In each case, the arbitrator shall be selected and the arbitration proceeding conducted pursuant to procedures mutually satisfactory to the Company and the Union, and upon their agreed written stipulation of the issue to be arbitrated.

3. (a) The award of an arbitrator upon any grievance subject to arbitration as herein provided shall be final and binding upon all parties to this agreement, provided that no arbitrator shall have any authority to add to, detract from, or in any way alter the provisions of this agreement or determine the arbitrability of any issue.

(b) It is specifically agreed that matters relating to the management of the Company, including but not limited to the right to control operations and the assignment of work, subcontracting of work, the establishment or modification of any wage, salary or job classifications, or the authority to decide the appropriate classification of any employee shall not be subject to arbitration. It is also agreed that the mere inclusion of the Recognition Article in this Agreement is not intended to be a matter subject to arbitration and that the arbitrator shall have no authority to interpret or apply this Article.

(c) In addition, notwithstanding any contrary provision of this Article, no provision of this agreement or other agreements between the parties shall be subject to arbitration pertaining in any way to the establishment, administration, interpretation or application of Insurance, Pension, Savings, or other benefit plans in which the Company employees are eligible to participate.

solely on contracting out would not be arbitrable. Here, however, there is no such provision.' " (quoting *Warrior, supra*, 363 U.S. at 584, 80 S.Ct. at 1353, 4 L.Ed.2d at 1418).

4. This Arbitration Article shall be construed according to the understanding of the parties that they do not intend that arbitration shall be a means of deciding all disputes which may arise between them during the term of this agreement and which they are unable to resolve through negotiation or by means of the grievance procedure, but shall be construed instead to mean that there shall be subject to arbitration only those disputes which the parties have specifically and plainly agreed to arbitrate as provided above.

## ARTICLE XII

### STRIKES AND LOCKOUTS

1. There shall be no strike, sit-down, slow-down, employee demonstration or any other organized or concerted interference with work of any kind in connection with any matter subject to the grievance procedure, and no such interference with work shall be directly or indirectly authorized or sanctioned by the Union, or their respective officers or stewards, unless and until all of the respective provisions of the successive steps of the grievance procedure set forth in Article X shall have been complied with by the Union. The foregoing exception will not apply if (a) the matter is submitted to arbitration as provided in Article XI, or (b) 12 months shall have elapsed after receipt by the Union of the Company's final decision on the grievance at Step Three, or (c) the Company shall not have received written or telegraphic notice of such strike from the Union more than 24 hours prior to the commencement of such strike, which notice will specify the exhausted grievance over which the strike is being called. Upon receipt by the Company of such strike notice, the Company and the Union will meet immediately to discuss the dispute and the contemplated action so that management may assess the situation.

2. The Company will not lock out any employee or transfer any job under dispute from the plant nor will the management take similar action while a disputed job is under discussion at any of the steps of the Grievance Procedure as set forth in Article X, or if the matter is submitted to arbitration as provided in Article XI.

## ARTICLE XIII

### REDUCTION OF FORCES

1. (a) In all cases of layoff or transfer due to lack of work, total length of continuous service shall be the major factor determining the employees to be laid off or transferred (exclusive of upgrading). However, ability will be given consideration.

(b) Similarly, in all cases of rehiring after layoff, such total length of continuous service shall be the major factor determining such rehiring.

(c) The provisions of Section 1(a) and 1(b) of this Article shall apply to employees who have one year or more of service credits.

2. The Union and management shall negotiate a Supplemental Agreement which shall set forth the details of the layoff procedure. Such Supplemental Agreement shall be subject to and be deemed to include all of the provisions of this Article.

3. (a) Employees who have been or may be transferred to jobs outside the bargaining unit may be returned to their former classification in the bargaining unit as follows:

(1) Employees transferred on or before September 30, 1963:

a. directly to engineering or supervisory positions may be returned in accordance with their total length of continuous service;

b. directly to other than engineering or supervisory positions may return only on available openings and shall have their service for purposes of layoff and rehiring calculated as follows:

(i) their service shall date from the effective date of such transfer during the two years following such transfer.

(ii) after accumulating two years of service in the bargaining unit their to-

tal length of continuous service with the Company shall be used.

(2) Employees transferred after September 30, 1963 but on or before May 26, 1973:

a. directly to engineering or supervisory positions may be returned in accordance with their total length of continuous service;

b. directly to other than engineering or supervisory positions may be returned in accordance with their total length of continuous service at the time they left the unit, plus the amount of continuous service accumulated outside the unit up to a maximum of one year. Two years after their return to the bargaining unit, their total length of continuous service with the Company will be used.

(3) Employees who have been or may be transferred after May 26, 1973:

a. directly to supervisory positions may be returned in accordance with their total length of continuous service;

b. directly to other than supervisory positions may return only on available openings and shall have their service for purposes of layoff and rehiring calculated as follows:

(i) their service shall date from the effective date of such transfer during the two years following such transfer.

(ii) after accumulating two years of service in the bargaining unit their total length of continuous service with the Company shall be used.

(4) In the event that an employee cannot be placed on his former classification under the provisions of this Section 3(a), he will be considered in accordance with the Supplemental Agreement covering the Layoff Procedure and Rehiring after Layoff.

(b) Employees transferred into the bargaining unit subsequent to May 26, 1973 and employees whose service is restored under Article VII, Sections 2(e) and 2(f), shall have their service for purposes of layoff and rehire calculated as follows:

(1) Their service shall date from the effective date of such transfer during the two years following such transfer.

(2) After accumulating two years of service in the bargaining unit their total length of continuous service with the Company shall be used.

4. An employee may:

(a) retire at his or her option as provided in the Company Pension Plan; or

(b) be retired by the Company upon reaching the age for normal retirement as provided in the Company Pension Plan (age 65), whether or not such employee is a participant in the Plan.

## ARTICLE XIV

## LIST OF HIRINGS, LAYOFFS AND TRANSFERS

1. The Union will be given details on employees laid off for lack of work after notification has been given to the employees and similar information on re-engaged employees after they have been rehired.

2. The information will consist of name, continuous service date, classification of the employee, and the name of the supervisor. The supervisors will give to the stewards information on extended layoffs whenever possible one (1) week before the employee is laid off.

3. The Union will also be given list of new employees after they have been engaged, their classification and their supervisor and the Union will also be given details on transfers which are made through the Employment Office.

4. In addition, a management representative will provide the Area Vice President of IFPTE with information regarding layoffs and transfers taking place in the Department.

5. On a quarterly basis the Company will provide the Union with a list of all employees in the bargaining unit including infor-

mation which consists of employee's name, unit code, classification and rate of pay, continuous service date and seniority date.

6. The Company will provide information to employees affected by a lack of work regarding applicable aspects of the various Company benefit plans.