DECISION
Before this Court is the Verified Complaint of the Central Falls School District Board of Trustees ("Board of Trustees"). In its two count, one hundred and five paragraphs Complaint, the Board of Trustees seeks a declaration adjudging that a grievance filed by the Central Falls Teachers Union ("Union") is not arbitrable. The Board of Trustees also asks this Court to preliminarily and permanently enjoin the pending arbitration of the grievance. Presently, the Board of Trustees moves for summary judgment on both counts of its Verified Complaint pursuant to Super. R. Civ. P. 56, and the Union objects.
 I Facts and Travel
The Board of Trustees and the Union are parties to a collective bargaining agreement ("CBA") effective from September 1, 2008 through August 31, 2011. Per the terms of the CBA, the Union serves as the exclusive bargaining representative for the Board of Trustees' certified employees. (Pl's Mem. of Law in Supp. of Mot. for Summ. J. (hereafter "Pl's Mem.") Ex. 1 at 3.) The dispute in the instant case involves Central Falls High School, which in January 2010, was identified by the Commissioner of the Rhode Island Board of Regents as a "persistently *Page 2 
lowest-achieving school." (Pl's Mem. Ex. 3, ¶ 3.) In an effort to comply with the Board of Regents' Protocol for Interventions, the Board of Trustees elected to follow the Transformation Model — one of four paradigms for school reform articulated by theProtocol for Interventions. Id at 4. The adoption of the Transformation Model permitted the Board of Trustees to implement a number of changes which include, but are not limited to, replacing the principal who led the school prior to the commencement of the Transformation Model and terminating the entire Central Falls High School faculty. (Pl's Mem. Ex. 4 at 6-7; Pl's Mem. Ex. 3 at ¶ 5.) The Board of Trustees' decision to terminate the Central Falls High School faculty spurred a dispute with the Union, which led to mediation. (Pl's Mem. Ex. 3 at ¶ 6.) Following mediation, the Board of Trustees and the Union reached an agreement ("Settlement Agreement") that modified numerous provisions of the parties' CBA. (See generally Pl's Mem. Ex. 6.)
In its efforts to "improve instructional quality" and to "further the educational mission of the Central Falls School District" ("CFSD"), the Board of Trustees joined The Principals' Residency Network ("PRN") — a program sponsored by the Center for Leadership and Educational Equity. See Pl's Mem. Ex. 3 ¶¶ 9, 11. The objective of the PRN program is for an aspiring principal to gain "practical knowledge of the duties of the school principal," which is first accomplished by pairing an aspiring principal with a mentoring principal. Id at ¶ 10. Following a period of mentoring, the aspiring principal will take on "some administrative duties as part of his [or her] residency experience." Id
Notice of the Board of Trustees' implementation of the PRN program was sent to all Central Falls teachers in March 2010.Id at ¶ 12. With respect to Central Falls High School, Joshua LaPlante was the only teacher who expressed an interest in the PRN program for the 2010-11 school year. *Page 3 Id. Consequently, Superintendent Frances Gallo[1] of the CFSD approved Mr. LaPlante's participation in the PRN program.Id. at 8. Superintendent Gallo's approval provided that Mr. LaPlante would be granted "a reduction in his teaching schedule of one period" in order to participate in the program.Id.
Although Superintendent Gallo believed that Mr. LaPlante's participation in the PRN program "did not increase the workload or have an effect on the salary of any other teacher," the Union disagreed. Id. at 13. According to the Union, Mr. LaPlante was "already working a reduced schedule" at the time of his appointment to the PRN program. (Def's Obj. to Pl's Mot. for Summ. J. (hereafter "Def's Mem.") Ex. 1, ¶ 7.) In the Union's view, as a result of Superintendent Gallo's reduction of Mr. LaPlante's teaching duties, "it would follow that another teacher had to pick up [Mr. LaPlante's] schedule." Id. Although the Union found no fault with Mr. LaPlante's selection to participate in the PRN program, it asserted that Mr. LaPlante's participation must be accomplished "without shifting work to other teachers."Id. at ¶ 9.
On October 6, 2010, the Union filed a grievance in support of its contention that Mr. LaPlante's participation in the PRN program caused work to be reassigned to other teachers.Id. at ¶¶ 7-10. Specifically, the Union contended that the Board of Trustees "violated Article IV, Section 4A and Article V, Section 39A when it reduced the teaching load of less senior teachers in a department/activity."[2] (Def's Mem. Ex. 6 at 3.) The provisions of the CBA cited by the Union state in relevant part: *Page 4 
 ARTICLE IV POLICY MATTERS AT THE SCHOOL AND DISTRICT LEVEL * * * * Section 4A High School Schedules
 Each teacher within a department must receive a full schedule, provided there are sufficient classes to accomplish this . . . The administration must make every effort to provide a full schedule to each teacher within the department based upon certification, student enrollment and course availability. (Pi's Mem. Ex. 1 at 18.)
 * * * * ARTICLE V WORKING CONDITIONS * * * * Section 39A Middle High School Class Load, Team Composition, and Duty Assignments
 * * * * If there are insufficient classes in a given department or on a given team to assign a full teaching load to each available teacher, then the reduced teaching load shall be assigned based upon the certification held by members of that department or team with further consideration given to seniority, i.e. less senior teachers shall be assigned full teaching loads first
(Pi's Mem Ex 1 at 55) (emphasis added).
 * * * * *Page 5 
To resolve the grievance, the Union requested that the Board of Trustees "assign a full teaching load to each teacher in a department/academy." (Def's Mem. Ex. 6 at 3.) If the Board of Trustees declined to reduce class size or provide additional class options for students, then the Union asserted that less senior teachers in the department should be assigned a full teaching load first. Id.
On January 25, 2011, the Board of Trustees unanimously voted to deny the Union's grievance. (Def's Mem. Ex. 8 at 1.) In support of its decision, Anna Cano-Morales on behalf of the Board of Trustees wrote:
 . . . we believe that this matter is not subject to the grievance and arbitration process. The accommodation is clearly a substantive staffing decision. The May 15, 2010 Settlement Agreement, Subsection I, plainly excludes such matters from the grievance and arbitration process. . . . Id.
On March 1, 2011, the Union moved for arbitration, noting that it had submitted a demand for arbitration to the American Arbitration Association. (Def's Mem. Ex. 9 at 1.)
On March 29, 2011, the Board of Trustees filed its Verified Complaint for declaratory and injunctive relief, which was followed by the Union's Motion to Dismiss. On May 4, 2011, this Court heard and summarily denied the Union's Motion to Dismiss. This matter is now before the Court on the Board of Trustees' Motion for Summary Judgment as to both counts of its Verified Complaint. *Page 6 
 II The Parties' Arguments A The Board of Trustees
In support of its Motion for Summary Judgment, the Board of Trustees first avers that the grievance is not arbitrable under the terms of the May 2010 Settlement Agreement. According to Section I of the Settlement Agreement,
 [i]t is mutually agreed that disputes relating to an alleged failure to adhere to the process established in the Instructional Staffing Policy and Instructional Staff Hiring Protocol or the evaluation process shall be grievable, but that substantive disputes relating to staffing decisions, including, but not limited to assignment, involuntary transfer, and evaluation, shall not be grievable, but may be appealed to the Superintendent. (Pl's Mem. Ex. 5 at 3) (emphasis added).
The Board of Trustees asserts that the instant grievance deals with an administrative decision as to who should receive a reduction in his or her teaching schedule. In the Board of Trustees' view, the decision to reduce a teaching schedule is undoubtedly a staffing decision. Consequently, the Board of Trustees believes that the clear and unequivocal language of Section I renders the instant grievance non-arbitrable.
The Board of Trustees also contends that the Settlement Agreement incorporated the Transformation Model for school reform, meaning the Board of Trustees has the authority to create flexible work schedules. The Transformation Model had a significant impact on the terms and conditions of employment, such as increasing the length of the instructional day and requiring the Board of Trustees to foster staff development to ensure more effective teachers and staff administrators. Specifically regarding staff development, the Transformation Model states:
 [a] transformation model is one which the [local education agency] must implement each of the following strategies: *Page 7 
 * * * * (e) Implement strategies such as financial incentives, increased opportunities for promotion and career growth, and flexible work conditions that are designed to recruit, place, and retain staff with the skills necessary to meet the needs of the students; and
 (f) Require that teacher and principal mutually consent to staff assignment, regardless of teacher seniority. (Pi's Mem. Ex. 4 at 6-7) (emphasis added).
In light of this language, the Board of Trustees submits that the Settlement Agreement — by incorporating the Transformation Model[3] — includes the requirement that flexible work schedules shall be permitted in order to allow for professional growth. The Board of Trustees asserts that because the Union assented to the fact that the Transformation Model would be implemented, the Union cannot have a legitimate grievance regarding the Board of Trustees' reduction of Mr. LaPlante's teaching schedule.
Next, the Board of Trustees argues that the management rights clause of the CBA enables it to manage its business affairs absent an express agreement within the four corners of the CBA. To support its position, the Board of Trustees cites the Preamble of the CBA, which states in relevant part:
 [i]t is agreed that the Board retains the right to establish and enforce reasonable rules and personnel policies relating to the duties and responsibilities of teachers and their working conditions which are not inconsistent with this Agreement. In all matters under this Agreement calling for the exercise of judgment or discretion on the part of the Board the decision of the Board shall be final and binding if made in good faith, except where otherwise provided in this Agreement
(Pi's Mem Ex 1 at 1) (emphasis added). *Page 8 
The Board suggests that this Court should consider Central FallsSch. Dist. Bd. of Tr.'s v. Central Falls Teachers' Union, No. PC 07-4684, 2008 WL 4176770, at *1 (R.I. Super. Ct. Aug. 7, 2008) (Savage, J.), wherein that Court was asked to determine whether a grievance concerning the Board of Trustees' decision to promote one candidate over another to a Department Chair position was arbitrable. Relying in part on the language of the Preamble, Justice Savage determined that the Board of Trustees' "decision [was] final and binding — and not subject to arbitration — as long as it [was] made in good faith and the CBA [did] not provide otherwise."Id. at *13. In the instant case, the Board of Trustees asserts that the grievance fails to allege that the Board of Trustees acted in bad faith by selecting Mr. LaPlante to participate in the PRN program. Thus, just as the Court found in the 2008 Central FallsSch. Dist. case, the Board of Trustees believes that this Court should conclude that the Preamble of the CBA cloaks it with the managerial authority to permit Mr. LaPlante to participate in the PRN program and therefore find that the grievance is non-arbitrable.
Lastly, the Board of Trustees raises a public policy argument. Specifically, the Board of Trustees claims that the decision to grant a scheduling accommodation so that Mr. LaPlante could participate in the PRN program falls within the legally, non-delegable management authority of the Board of Trustees. The Board of Trustees argues that governmental agencies — particularly school committees — cannot agree to surrender their statutory powers and responsibilities to an arbitrator. N. Providence Sch. Comm. v. N. Providence TeachersUnion, 945 A.2d 339, 346 n. 12 (R.I. 2008) (holding even in the absence of statutory mandates "school committees are vested with a plethora of powers and responsibilities that relate to the essence of the educational mission that may not be bargained away[]"). The Board of Trustees relies on §§ 16-2-9, 16-2-11, and 16-2-34 to support its claim that it had the statutory authority to permit *Page 9 
Mr. LaPlante to participate in the PRN program in the interest of improving CFSD's instructional quality. Because the decision to allow Mr. LaPlante to participate in the PRN program falls into the class of decisions made to enhance learning in the District and its overall educational mission, the Board of Trustees believes the grievance cannot be deemed subject to arbitration.
 B The Union
In response, the Union claims that the Settlement Agreement does not preclude arbitration of the grievance. The Union asserts that the Board of Trustees mistakenly characterizes the dispute as a "staffing decision," when the issue, in its view, pertains to teaching "workload." The Union argues that because teaching workload cannot be construed to fall under the general umbrella of a "staffing decision" as articulated by Section I of the Settlement Agreement, the parties did not mutually agree to exclude the instant dispute from the grievance process.[4]
Next, the Union argues that the Board of Trustees' Motion for Summary Judgment may not be granted because a genuine issue of material fact exists in the instant case. Specifically, the Union contends that whether the Board of Trustees' decision to reduce Mr. LaPlante's teaching schedule violated the CBA or was a matter of educational policy is a genuine issue of material fact exclusively reserved to an arbitrator. The Union relies on the 2008 N.Providence *Page 10 Sch. Comm. decision in which the School Committee argued that its decision to eliminate the composition period[5] for English teachers at North Providence High School did not violate the parties' collective bargaining agreement. 945 A.2d at 341. The School Committee asserted that the decision to eliminate the composition periods was for "budgetary reasons," and that Title 16 of the Rhode Island General Laws provided the statutory authority for its educational policy decisions. Id. at 341-42. In the School Committee's view, educational policy decisions could not be bargained away via collective bargaining. Id.. The Supreme Court, on review of the School Committee's petition to vacate the arbitration award, held:
 [i]f the school committee had justified the elimination of the composition period on the primary basis that said elimination was undertaken for the purpose of improving the education of North Providence High School students in English and if the school committee had explained its thinking in that regard in a cogent manner, it is entirely possible that we would have considered that administrative decision to be non-arbitrable. Id. at 347.
The Union claims that the parties in the N. Providence Sch.Comm. case had the benefit of a fair and full hearing before an arbitrator who concluded that the School Committee's decision was based on budgetary and teaching load concerns, not educational policy. The Union suggests that in order to determine whether the dispute in this case is a matter of educational policy — and thus non-arbitrable — an arbitrator must be permitted to make findings of fact at a hearing. United Paperworkers Int'l Union, AFL-CIO v.Misco, Inc., 484 U.S. 29, 38 (1987) (holding "[t]o resolve disputes about the application of a collective bargaining agreement, an arbitrator must find facts"). Therefore, the Union argues that this Court cannot grant summary judgment, *Page 11 
because in doing so, it would be forced to make findings of fact which should be left to the exclusive province of an arbitrator.
Lastly, the Union claims that the Board of Trustees is not entitled to injunctive relief. The Union argues that because the Board of Trustees is statutorily bound to negotiate with the Union regarding the terms and conditions of a teacher's employment, the Board of Trustees cannot demonstrate a likelihood of success on the merits. Additionally, the Union asserts that the Board of Trustees has failed to show that it has no adequate legal remedy. In the Union's view, the Board of Trustees has an adequate legal remedy if it faces an adverse arbitration award because an "arbitration award may be overturned if the award was irrational or if the arbitrator manifestly disregarded the law." Purvis Sys.,Inc. v. Am. Sys. Corp., 788 A.2d 1112, 1115 (R.I. 2002).
 III Standard of Review
On a motion for summary judgment, this Court reviews the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. Chavers v. Fleet Bank (RI), N.A.,844 A.2d 666, 669 (R.I. 2004). "Summary judgment is appropriate if it is apparent that no material issues of fact exist and the moving party is entitled to judgment as a matter of law." Id. On such a motion, the Court is not permitted to resolve any such factual issues. Therefore, the emphasis is on "issue finding and not issue determination." O'Connor v. McKanna,116 R.I. 627, 633, 359 A.2d 350, 353 (1976). A party opposing a motion for summary judgment "carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions." Chavers,844 A.2d at 669-70 (internal citation omitted). *Page 12 
The "Uniform Declaratory Judgments Act, G.L. 1956 chapter 30 of title 9, gives the Superior Court broad discretion to `declare rights, status, and other legal relations whether or not further relief is or could be claimed.'"Arnold v. Lebel, 941 A.2d 813, 817 (R.I. 2007) (quoting § 9-30-1). The Act provides that any person
 interested under a . . . written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder. Section 9-30-2.
Though a Court's power to declare rights "is broadly construed," its "decision to grant or to deny declaratory relief under the Uniform Declaratory Judgments Act is purely discretionary." BradfordAssocs. v. Rhode Island Div. of Purchases,772 A.2d 485, 489 (R.I. 2001).
Lastly, for the issuance of an injunction, a moving party must show (1) whether the moving party established a reasonable likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm without the requested injunctive relief; (3) whether the balance of the equities, including the public interest, weighed in favor of the moving party; and (4) whether the issuance of a preliminary injunction served to preserve the status quo ante. Allaire v. Fease,824 A.2d 454, 457 (R.I. 2003).
 IV Analysis Settlement Agreement
Our Supreme Court has held that "[t]he terms of a collective bargaining agreement dictate the arbitrability of a labor dispute."Dep't of Corr. v. Rhode Island Bhd. Of Corr. Officers,866 A.2d 1241, 1248 (R.I. 2005). Moreover, a duty to arbitrate a dispute arises only when a party agrees to arbitration in clear and unequivocal language, and even then, the party is *Page 13 
only obligated to arbitrate issues that it explicitly agreed to arbitrate. Bush v. Nationwide Mut. Ins. Co.,448 A.2d 782, 784 (R.I. 1982).
In the instant case, the Union asserts that the dispute concerning Mr. LaPlante's participation in the PRN program is a "grievance" as defined by the CBA. According to Article III, Section 1,
 [a] grievance is a claim by an employee that he or she has been treated unfairly, or it is a claim that there has been a violation, misinterpretation or misapplication of the provisions of this agreement, established policy or practice. (Pl's Mem. Ex. 1 at 12.)
In its memorandum, the Union suggests that
 [t]he parties agreed to a broad arbitration clause. The parties could have easily incorporated language into the CBA limiting arbitration to certain types of disputes or excluding certain disputes from arbitration, but they chose not to. (Def's Mem. at 8.) (Emphasis added.)
This Court notes that "as a prerequisite to an order for summary judgment, the trial justice must review the pleadings, affidavits, . . . and other appropriate evidence from a perspective most favorable to the party opposing the motion." Steinberg v.State, 427 A.2d 338, 340 (R.I. 1981). When the evidence in this case — particularly the CBA and Settlement Agreement — is viewed in the light most favorable to the Union, the Court cannot agree with the Union's position that the "the parties agreed to a broad arbitration clause."
Here, this Court is guided by the May 2010 Settlement Agreement. The Settlement Agreement states in relevant part:
 [t]he terms of the agreement set forth herein are in direct response to the identification of Central Falls High School (CFHS) as a Persistently-Lowest Achieving School. . . . It is explicitly understood and agreed that all agreements contained herein shall supersede any and all contrary existent language set forth in the collective bargaining agreement between the Central *Page 14 Falls School District (CFSD) and the Central Falls Teachers' Union (CFTU). (Pl's Ex. 5 at 1.) (Emphasis added.)
According to Section I of the Settlement Agreement, "[i]t ismutually agreed . . . that substantive disputes relating to staffing decisions, including, but not limited to assignment, involuntary transfer, and evaluation shall not begrievable. . . ." (Pl's Ex. 5 at 3.) (Emphasis added.) Though the scope of grievable matters may have been broad prior to
May 2010, Section I clearly limited the scope of grievances that could be brought under Article III of the CBA. The Union Representative's signature and ultimate ratification of the Settlement Agreement confirms that there was a mutual understanding of this fact. Consequently, the Union's assertion that a "broad arbitration clause" exists is unsupported by the plain and unequivocal language of the Settlement Agreement. Bush,448 A.2d at 784 (stating the duty to arbitrate arises only when the parties agree to arbitration in clear and unequivocal language).
What remains, then, is the question of whether or not Superintendent Gallo's decision to reduce Mr. LaPlante's teaching schedule constitutes a "staffing decision." In Local 13, Int'lFed. of Prof'l Technical Eng'rs v. Gen. Elec. Co., a dispute arose between the union and General Electric ("GE") when GE notified Pennsylvania plant workers that some of their work assignments would be transferred and reassigned to GE employees in Iowa. 531 F.2d 1178, 1179 (3d Cir. 1976). The union pursued a grievance, claiming that work reassignment violated the collective bargaining agreement. Id. GE refused arbitration of the issue, referencing the provision of the parties' CBA which stated "[i]t isspecifically agreed that matters relating to . . the right to control operations and the assignment of work . . . shallnot be subject to arbitration." Id. (Emphasis added.) Consequently, GE argued that the arbitration agreement excluded from arbitration any dispute which concerned the transfer of work outside the union's bargaining unit. Id. at 1180. The union argued that GE's reassignment of work would have a *Page 15 
significant impact on contractual provisions which pertained to the seniority of its members, and therefore, the matter was arbitrable.Id. at 1180-81. The trial judge for the District Court agreed with the union, concluding that GE's actions violated numerous seniority and discrimination provisions of the parties' collective bargaining agreement. Specifically, the trial judge held:
 although GE has not agreed to arbitrate the assignment of work, they have agreed to arbitrate the seniority and discrimination clauses of the collective bargaining agreement. Therefore, when the assignment of work appears to be violative of these latter two provisions of the agreement, the provisions regarding the nonarbitrability of the assignment of work must succumb to the provisions against discrimination and the provisions concerning seniority. Id. at 1182.
Consequently, the trial judge granted the union's request that GE be enjoined from reassigning work to its Iowa location. Id.
On appeal, the U.S. Court of Appeals for the Third Circuit reversed, finding that the provisions pertaining to seniority and discrimination could not undo the "explicit exclusion of assignment of work from arbitration." Id. at 1184. TheLocal 13 Court held that because GE demonstrated that it had the right to assign work pursuant to the terms of its contract, it reversed the judgment of the District Court and remanded the case with the instruction to vacate the injunction.Id. at 1115.
Similar to the union's position in Local 13, the Union in the instant case argues that Superintendent Gallo's actions have had a significant impact on contractual provisions which pertain to the seniority of its members, and therefore, the matter is arbitrable. Specifically, the Union asserts that although Section 39A of the CBA requires that "less senior teachers shall be assigned full teaching loads first," Superintendent Gallo's actions have enabled a less senior *Page 16 
teacher to have a lighter teaching load.[6] This Court notes that "[w]hether or not a company is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court, and a party cannot be forced to `arbitrate the arbitrability question.'" Litton Fin. Printing Div. v. Nat'l Labor RelationsBd., 501 U.S. 190, 208 (1991) (quoting ATT Technologies,Inc. v. Commc'ns Workers, 475 U.S. 643, 651 (1986)). Although doubts concerning arbitrability should be resolved in favor of arbitration, a court "must determine whether the parties agreed to arbitrate [the] dispute, and [a court] cannot avoid that duty because it requires [it] to interpret a provision of a bargaining agreement." Litton, 501 U.S. at 209.
After considering Central Falls High School's status as a "persistently-lowest achieving school," the implementation of the Transformation Model (which required that the Board of *Page 17 
Trustees have "sufficient operational flexibility (such as staffing, calendars/time . . .)") and the Settlement Agreement's clear indication that the Transformation Model would be implemented "as fully set forth in the Protocols] forIntervention," this Court finds that Superintendent Gallo's decision must be interpreted to be a "staffing decision" which, by the plain language of Section I of the Settlement Agreement, the parties agreed "shall not be grievable". See Pi's Mem. Ex. 3, If 3; Pi's Mem. Ex. 4 at 7; Pi's Mem. Ex. 5, § J. It follows, therefore, that the dispute over the reduction of Mr. LaPlante's teaching schedule incidental to his assignment to participate in the PRN program is not arbitrable. The Court grants summary judgment, finding that the Plaintiff, Board of Trustees is entitled to judgment as a matter of law. Chavers844 A.2d at 669 (holding summary judgment is appropriate if it is apparent that no material issues of fact exist).
In as much as this Court's interpretation of the Settlement Agreement is dispositive with respect to the issue of arbitrability of the grievance, it is unnecessary to consider other issues raised by the Plaintiffs complaint.
 V Conclusion
This Court concludes that there are no genuine issues of material fact to be decided regarding the arbitrability of the Union's October 2010 grievance because Section I of the 2010 Settlement Agreement explicitly excludes substantive disputes relating to staffing decisions from the grievance process. Therefore, the Board of Trustees' Motion for Summary Judgment is granted.
Counsel for the Board of Trustees shall submit an appropriate judgment for entry.
[1] This Court notes that Superintendent Gallo is not related to the within hearing justice.
[2] Section 4A of the parties' CBA provides that "[h]igh school teachers shall not be assigned administrative duties." (Pl's Mem. Ex. 1 at 17.) Although the PRN program expressly provides for the completion of administrative duties, the Union's grievance does not appear to contest this issue. See Def s Mem. of Law at 9 stating, [p]ut another way, the instant dispute, in the Union's view, has nothing to do with staffing; and everything to do with work loads . . . Nor does the "staffing dispute" relate to the [Board of Trustee's] assignment of administrative duties to LaPlante; another contract violation. . . . The Court should be aware that the Union is not necessarily opposed to increased duties for teachers.
[3] According to Section J of the Settlement Agreement, "[t]he Superintendent commits to implementing the Transformation Model as fully set forth in the Protocol for Intervention[s]: PersistentlyLowest-Achieving Schools." (Pl's Mem. Ex. 5 at 3.) The Settlement Agreement was signed by Superintendent Gallo on behalf of the Board of Trustees and by the Union's Representative, Jane Sessums.See id. at 4.
[4] Though the Union has taken the firm stance that Section I of the Settlement Agreement does not pertain to the instant dispute, the Union also posits that any doubt as to the arbitrability of the instant dispute must be resolved in favor of arbitration.Providence Teachers Union v. Providence Sch. Comm.,433 A.2d 202, 205 (R.I. 1981) (holding a court shall rule in favor of submitting the dispute to arbitration unless the arbitration clause of the collective bargaining agreement cannot be interpreted to include the asserted dispute and that all doubts should be resolved in favor of arbitration).
[5] Composition periods gave English teachers "time in which to correct papers and work individually with students on the development of their writing skills." N. Providence Sch.Comm., 945 A.2d at 341.
[6] During the July 11, 2011 hearing on the Board of Trustees' motion, it asserted that the Union failed to demonstrate that another teacher assumed Mr. LaPlante's teaching duties. Specifically, the Board of Trustees relies on the affidavit of Superintendent Gallo, wherein she stated:
 Mr. LaPlante's participation in the Principals' Residency Network did not increase the workload or have an effect on the salary of any other teacher. (Pl's Mem. Ex. 3, ¶ 13.)
The Union's Representative, Jane Sessums, responded to Superintendent Gallo's claim by alleging
 [s]ince Mr. LaPlante was teaching fewer classes, it would follow that another teacher had to pick up that schedule
(Def s Mem Ex. 2, ¶ 7) (emphasis added).
In the Board of Trustees' opinion, the language "it would follow that" is nothing more than a general allegation or conclusion. Consequently, the Board asserted that the Union failed to meet its burden to show the existence of a material issue of fact, and therefore, summary judgment must be granted.Chavers, 844 A.2d at 669-70 (stating that a party opposing a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material fact, and cannot rest on general allegations or conclusions).
This Court declines to make a finding as it pertains to the Board of Trustees' position. If it were to do so, the Court believes that it would be ruling on the merits of the instant dispute — an act it is not permitted to do. See Rhode IslandCourt Reporters Alliance v. State, 591 A.2d 376, 378 (R.I. 1991) (holding a court has no business weighing the merits of a grievance because in doing so, it would usurp a function which is entrusted to the arbitration tribunal). *Page 1