Tyler V. CHAVERS et al.

v.

FLEET BANK (RI), N.A. et al.

No. 2002–201–Appeal.

Supreme Court of Rhode Island.

Feb. 11, 2004.

Lauren E. Jones, Providence, for Plaintiff.

Steven E. Snow, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY and SUTTELL, JJ.

## OPINION

WILLIAMS, Chief Justice.

Lured by the promise of low, fixed annual percentage rates (APR) and other favorable terms, the named plaintiffs, Tyler V. Chavers, Alexandra H. Lossini and Daniece A. Owsley Burns, opened credit-card accounts with Fleet Bank (RI), N.A. Upon learning that the APR on their accounts would be raised, the plaintiffs initiated this class action suit[1] against the defendants, Fleet Bank (RI), N.A., Fleet Credit Card Services, L.P., Fleet Credit Card Holdings, Inc., FleetBoston Financial Corporation, and Does 1–10 (collectively referred to as Fleet). The plaintiffs sought damages and equitable relief for violations of Rhode Island's Deceptive Trade Practices Act (DTPA), G.L. 1956 chapter 13.1 of title 6, and breach of contract. Fleet was granted summary judgment on both counts. The plaintiffs' appeal is now before this Court.

For the reasons explained below, we affirm the judgment as it pertains to the DTPA claim. We, however, vacate the portion of the judgment pertaining to plaintiffs' breach of contract claim and remand for further proceedings on that claim.

## I

### Facts and Travel

During 1999 and 2000, Fleet engaged in a nationwide advertising campaign, urging individuals to open credit-card accounts with Fleet. As part of the campaign, Fleet sent solicitation letters to presumably thousands of people asking them to transfer balances from other credit cards and to make purchases using their Fleet credit cards. The solicitations offered a non-introductory, fixed APR of 8.5 percent or lower applicable to balance transfers that "starts low and can stay low." The solicitation further promised there would be no annual fees.

The plaintiffs received those solicitations. Based on the advertised terms, plaintiffs opened accounts, began making purchases with their new credit cards, and transferred balances from other accounts. In April 2000, Fleet informed plaintiffs that the "fixed" APR would be increasing because of a rise in the interest rates set by the Federal Reserve Board. Fleet gave some cardholders the option of either switching to a 9.5 percent variable APR or to a 10.5 percent fixed APR. Other cardholders were told that their APRs would increase to a fixed rate of 11.5 percent. In some instances, Fleet imposed annual membership fees.

Upset about the increased APR, at least one Fleet customer, Darlene AuCoin (AuCoin), wrote to the Office of the Comptroller of the Currency (OCC), which is the primary regulator of national banks, to complain about Fleet's "bait and switch tactics." The OCC replied to AuCoin, informing her that a case had been opened and the OCC would be contacting Fleet.[2] Thereafter, AuCoin received a second letter from the OCC concluding that, after reviewing her complaint, Fleet was not violating any federal rules or regulations. Therefore, the OCC wrote, it could offer AuCoin no further guidance and she would

1. The hearing justice entered summary judgment, however, before the case was certified as a class action.

2. In a letter dated May 23, 2000, Fleet responded directly to AuCoin describing the changes to the terms of her account. The letter from Fleet stated "Include [sic] with those changes was an increase to the interest rates on your." This was the final sentence of a paragraph and nothing else explains what is effected by the increase.

have to seek legal representation if she wanted to pursue the matter.

The plaintiffs filed a complaint in Superior Court against Fleet alleging violations of the DTPA and breach of contract. Fleet filed a motion to dismiss, arguing that Fleet was exempt from the DTPA because it was subject to regulation by the OCC. Fleet also argued that the Superior Court lacked subject matter jurisdiction to hear the breach of contract claim because plaintiffs were unable to meet the amount-in-controversy requirement set forth in G.L.1956 § 8–2–14.[3] The motion justice denied Fleet's motion, concluding that although the OCC has general authority over Fleet, there were no applicable regulations regarding deceptive credit-card solicitations. Fleet's motion to dismiss the breach of contract claim was also denied because plaintiffs requested equitable relief as well as monetary damages and therefore, pursuant to § § 8–2–13 and 14,[4] the court had subject matter jurisdiction to hear both claims. Upon Fleet's motion to reconsider, the motion justice reaffirmed her decision.

Thereafter, the case was transferred to the business calendar of the Superior Court, with a different Superior Court justice (second motion justice) presiding. Fleet then filed a motion for summary judgment presenting the same arguments set forth in its motion to dismiss. The plaintiffs countered that, because another motion justice had already rejected Fleet's arguments, the law of the case doctrine precluded summary judgment on both counts. The second motion justice, however, opined that the need for a national policy for banking issues constituted "special circumstances" that justified departure from the law of the case. Concluding that the OCC does have authority over Fleet's credit-card solicitations, thereby excepting plaintiff's claim from the DTPA, he granted Fleet's motion for summary judgment. Based on the disposition of the DTPA claim, the second motion justice also granted summary judgment in favor of Fleet on plaintiffs' breach of contract claim because it was not a proper case for equitable relief and, therefore, the court lacked jurisdiction pursuant to § 8–2–13.

The plaintiffs timely appealed. The OCC has filed an amicus brief in support of Fleet's position with respect to the OCC's power to take enforcement action against Fleet.

## II

### Summary Judgment

This Court reviews the grant of summary judgment on a *de novo* basis, applying the same standards as the motion justice. *Rubery v. Downing Corp.*, 760 A.2d 945, 946 (R.I.2000) (per curiam). Specifically, this Court reviews the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *Id.* Summary judgment is appropriate if it is apparent that no material issues of fact exist and the moving party is entitled to judgment as a matter of law. *Id.* A party opposing a motion for summary judgment " 'carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in

---

3. General Laws 1956 § 8–2–14 provides in pertinent part: "The superior court shall have * * * concurrent original jurisdiction with the district court in all * * * actions at law in which the amount in controversy exceeds the sum of five thousand dollars * * *."

4. Section 8–2–13 provides in pertinent part: "The superior court shall, except as otherwise provided by law, have exclusive original jurisdiction of suits and proceedings of an equitable character and of statutory proceedings following the course of equity * * *."

the pleadings or on conclusions or legal opinions.'" *United Lending Corp. v. City of Providence,* 827 A.2d 626, 631 (R.I. 2003).

## A
### Deceptive Trade Practices Act

The General Assembly, through the DTPA, has declared that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are * * * unlawful." Section 6–13.1–2. The DTPA provides a private right of action to recover actual and punitive damages and equitable relief for violations of its provisions. Section 6–13.1–5.2. Private actions, however, are precluded when the complained of activity is subject to regulation by a government agency. Specifically, the exemption contained in § 6–13.1–4 of the DTPA provides: "Nothing in this chapter shall apply to actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States."

The analytical framework for the above exception is set forth in *State v. Piedmont Funding Corp.,* 119 R.I. 695, 382 A.2d 819 (1978). In that case, the state brought an action against Piedmont Funding under the DTPA for allegedly employing deceptive practices to sell insurance and mutual funds. In applying the exception, this Court first considered whether the activities at issue were subject to the monitoring and regulation of regulatory agencies or officers. We noted that the sale of insurance is permitted only under the authority of an agency of this state and must not violate G.L. 1956 chapter 29 of title 27, which prohibits the use of deceptive trade practices in the sale of insurance. *Piedmont Funding Corp.,* 119 R.I. at 699–700, 382 A.2d at 822. The sale of securities in Rhode Island must comport with G.L. 1956 chapter 11 of title 7 and with federal rules and regulations. *Piedmont Funding Corp.,* 119 R.I. at 700, 382 A.2d at 822. "After the seller obtains permission or registers to engage in the activity of selling insurance or mutual funds in Rhode Island, he is subject to monitoring and regulation by the appropriate regulatory agency or officer. Therefore, * * * because the conduct at issue was clearly subject to the control of governmental agencies * * * it is within the exemption provision and not subject to the mandates of the [DTPA]." *Id.*

This Court then went on to say "[w]hen the party claiming exemption from the [DTPA] shows that the general activity in question is regulated by a 'regulatory body or officer' * * * the opposing party * * * then has the burden of showing that the specific acts at issue are not covered by the exemption." *Id.* Because the sale of insurance and mutual funds was subject to agency regulation, and noncompliance with applicable rules and regulations would result in revocation of a license to sell those products, the state did not meet "its burden of showing that the specific actions or transactions involved do not fall within the statutory exemption." *Id.*

This Court reapplied the exception outlined in *Piedmont Funding* one year later in *Perron v. Treasurer of Woonsocket,* 121 R.I. 781, 403 A.2d 252 (1979). The plaintiffs in *Perron* brought suit against the City of Woonsocket (city) under the DTPA after the municipal water department allegedly breached a contract with them. Under the contract, the water department, for a fee, agreed to tie into a privately owned water main to provide water to plaintiffs. Unsuccessful in its tie-in attempt, the city returned the plaintiffs' money "and told them to look elsewhere for relief." *Id.* at 783, 403 A.2d at 253–54.

We held that, although the water department's distribution and sale of water was subject to extensive supervision by the Public Utilities Commission, "[t]he hookup agreement was no more than a private contract between the city and plaintiffs." *Id.* at 786, 403 A.2d at 255. Accordingly, we held the plaintiffs sufficiently demonstrated that the specific acts at issue were not subject to agency regulation.

▮ Applying the two-step analysis set forth in *Piedmont Funding* and its progeny, it is clear that Fleet's credit-card solicitations fall squarely within the exception to the DTPA.

### 1. *General Regulation*

Under the first prong of the analysis, the question is whether the "general activity in question," in this case credit-card solicitations, is subject to control and monitoring by governmental agencies. Congress has enacted legislation directly aimed at credit card solicitations. In 1988, Congress amended the Truth in Lending Act (TILA), 15 U.S.C. § § 1601–1667f,[5] through the Fair Credit and Charge Card Disclosure Act. The Fair Credit and Charge Card Disclosure Act was enacted "to provide for more detailed and uniform disclosure by credit and charge card issuers, at the time of application or solicitation, of information relating to interest rates and other costs which may be incurred by consumers through the use of any credit or charge card." Act of October 19, 1988, P.L. 100–583, 1988 U.S.C.C.A.N. (102 Stat. 2860) 3936, 3937. 15 U.S.C. § 1637(c) of the TILA, entitled "[d]isclosure in credit and charge card applications and solicitations," requires that direct mail credit card solicitations disclose: APRs, any annual and other fees, grace periods, balance calculation methods and other pertinent information. This information must be "clearly and conspicuously disclosed" in a "[t]abular format." 15 U.S.C. § 1632(a) and (c). The card issuer may be subject to civil liability only to certain card holders for violations of 15 U.S.C. § 1637(c). *See* 15 U.S.C. § 1640(a). The OCC, however, is required to take other appropriate steps to enforce the provisions of the TILA against national banks. 15 U.S.C. § 1607.

In 15 U.S.C. § 1604(a) of the TILA, Congress delegated to the Federal Reserve Board the responsibility of promulgating regulations to implement the TILA. In response to that mandate, the Federal Reserve Board has issued a comprehensive and thorough set of Truth in Lending rules known as Regulation Z, 12 C.F.R. § 226 (2003). 12 C.F.R. § 226.5a of Regulation Z addresses "[c]redit and charge card applications and solicitations." Regulation Z, similar to the TILA, imposes certain disclosure requirements on credit card issuers. Under 12 C.F.R. § 226.5a(b), credit card solicitations must include information pertaining to APRs, annual or other fees, minimum finance charges, transaction charges, grace periods, balance computation methods, cash advance fees and over-the-limit fees. Under Regulation Z, the Federal Reserve Board also requires disclosures to be written "clearly and conspicuously." 12 C.F.R. § 226.5a(a)(2). Furthermore, certain disclosures must "be provided in a prominent location on or with an application or a solicitation, or other applicable document, and in the form of a table with headings, content, and format substantially similar to any of the applicable tables found in Appendix G." *Id.* The disclosure table required in the TILA and Regulation Z is commonly referred to as the "Schumer Box." *Roberts v. Fleet Bank (R.I.),* 342 F.3d 260, 266 (3d Cir.

---

5. The Truth in Lending Act is codified as Title I of the Consumer Credit Protection Act.

2003). The OCC oversees and monitors national banks for compliance with Regulation Z. *See Consolidated Bank, N.A. v. United States Department of the Treasury,* 118 F.3d 1461, 1462 (11th Cir.1997).

Like the sale of securities and insurance in *Piedmont Funding Corp.,* credit card solicitations by a national bank, such as Fleet, are subject to monitoring, supervision and regulation by federal agencies. The OCC oversees and monitors national banks for compliance with the provisions of the TILA and Regulation Z of the Federal Reserve Board. Failure to comply with the requirements of the above provisions can result in the initiation of enforcement proceedings by the OCC. Therefore, "because [credit-card solicitations are] clearly subject to the control of governmental agencies * * *, it is within the exemption provision and not subject to the mandates of the [DTPA]." *Piedmont Funding Corp.,* 119 R.I. at 700, 382 A.2d at 822.

### 2. *Specific Acts*

Having concluded that credit-card solicitations are subject to the regulatory governmental agencies, the question becomes whether plaintiffs can establish that the specific acts at issue, in this case Fleet's alleged deceptive solicitations, are not covered by the exemption. *Piedmont Funding Corp.,* 119 R.I. at 700, 382 A.2d at 822.[6] We hold that such solicitations do fall within the purview of the OCC's authority to enforce § 5(a) of the Federal Trade Commission Act (FTC Act), codified at 15 U.S.C. § 45(a) and, therefore, plaintiffs have failed to demonstrate that the exception does not apply. Accordingly, plaintiffs' private action under the DTPA is precluded as a matter of law.

The OCC is charged with the primary responsibility of regulating national banks, such as Fleet. *See Roberts,* 342 F.3d at 269 n. 5. In carrying out its supervisory responsibilities, the OCC operates under a comprehensive statutory framework set forth in 12 U.S.C. § 1818. Section 1818 provides the OCC with "wideranging supervisory and enforcement authority over our nation's banking system." *First National Bank of Scotia v. United States,* 530 F.Supp. 162, 166 (D.D.C.1982). Under 12 U.S.C. §§ 1818(b) and (c), the OCC is authorized to initiate cease-and-desist proceedings and issue temporary cease-and-desist orders against national banks for violation of any "law, rule, or regulation." *See also Roberts,* 342 F.3d at 270.

The OCC has used cease-and-desist orders "to regulate all areas of a bank's operations." *First Union National Bank v. Burke,* 48 F.Supp.2d 132, 137 (D.Conn. 1999) (quoting *In re Franklin National Bank Securities Litigation,* 478 F.Supp. 210, 217 (E.D.N.Y.1979)). In addition to its use of cease-and-desist proceedings, the OCC employs informal procedures to induce national banks' compliance with laws, rules and regulations. *Id.* at 137–38 (quoting *United States v. Philadelphia National Bank,* 374 U.S. 321, 330, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (noting that most banks follow "[r]ecommendations by the agencies concerning banking practices * * * without the necessity of formal compliance procedings") and *In re Franklin National Bank Securities Litigation,* 478 F.Supp. at 218 ("Achieving voluntary compliance with laws, recommendations and agreements is often the rule rather than the exception.")). For example, the OCC frequently issues commitment letters, memoranda of understanding and enters

---

**6.** Fleet maintains that its credit-card solicitations were truthful and in accordance with

the DTPA and other applicable laws, rules and regulations.

formal agreements[7] with banks "to achieve expeditious corrective and remedial action to return the bank to a safe and sound condition." *Special Supervision/Fraud and Enforcement Activities*, 21–1 O.C.C. Q.J. 21 (2002).

Drawing on its power to obtain compliance with any "law, rule, or regulation" under 12 U.S.C. § 1818, the OCC has routinely taken steps to enforce various state and federal statutes. *See, e.g., First National Bank of Gordon v. Department of Treasury, Office of the Comptroller of the Currency*, 911 F.2d 57, 59 (8th Cir.1990) (issuing cease-and-desist order for violations of 12 U.S.C. §§ 18 and 161(a)); *First National Bank of Bellaire v. Comptroller of the Currency*, 697 F.2d 674, 688 (5th Cir.1983) (affirming OCC's cease-and-desist order for violations of 12 U.S.C. § § 29, 375a and 30); *National State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981, 989 (3d Cir.1980) (holding that the OCC was responsible for enforcing a state antiredlining statute). We are of the opinion that the OCC's authority to enforce such laws includes the power to regulate Fleet's credit-card solicitations pursuant to the FTC Act.

Congress, under 15 U.S.C. § 45(a)(1), has proscribed "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce * * *." False or misleading advertisements and solicitations fall within the ambit of acts or practices prohibited under 15 U.S.C. § 45(a)(1). *See Roberts*, 342 F.3d at 269 (citing *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 226 (3d Cir. 1990)).

The Federal Trade Commission (FTC), in its role as a banking agency, has initiated enforcement proceedings against banks and bank officers to prevent violations of the FTC Act. In *Federal Trade Commission v. American Standard Credit Systems, Inc.*, 874 F.Supp. 1080, 1082 (C.D.Cal.1994), the FTC filed an action against bank officers to enjoin them from issuing deceptive credit card solicitations in violation of 15 U.S.C. § 45(a). The solicitations at issue in *American Standard* advertised that anyone and everyone "can qualify" for a credit card and invited interested individuals to call a "900" number to apply. *American Standard*, 874 F.Supp. at 1084. In reality, however, not everyone could qualify for the card. Rather, the issuing bank considered certain financial criteria before granting the credit. *Id.* at 1085. Also, to obtain the credit card, applicants had to pay an application fee and tender a $300 deposit to the bank to secure the line of credit. *Id.* Applicants learned of these restrictions only after paying a $9.95 fee to call the "900" number. *Id.* at 1087–88. The court held that those omissions and representations made in the solicitations were deceptive and misleading, and thus, violated § 5 (15 U.S.C. § 45) of the FTC Act. *American Standard*, 874 F.Supp. at 1088.

The Third Circuit has recognized the OCC's power to take similar action to prevent unfair and deceptive credit card solicitations. In *Roberts*, the court was presented with factual allegations that were identical to the allegations in this case. *See Roberts*, 342 F.3d at 262–64. There, Fleet sent the plaintiffs a solicitation letter offering a 7.99 percent fixed APR and boasting that the APR was "NOT an introductory rate." After the plaintiffs opened accounts, Fleet increased the APR to 10.5 percent. In response, the plaintiffs

---

7. Formal agreements are similar in content to cease and desist orders, but do not carry the threat of contempt or civil money penalties as a remedy for a breach. *Special Supervision/Fraud and Enforcement Activities*, 21–1 O.C.C. Q.J. 21, 22 (2002).

brought a class action suit against Fleet under, among other things, Rhode Island's DTPA. *Id.* at 264. The court held that, pursuant to its regulatory powers set forth in 12 U.S.C. § 1818, the OCC was authorized to bring enforcement actions against Fleet to prevent violations of 15 U.S.C. § 45. *Roberts,* 342 F.3d at 269–70. Thus, because of the OCC's authority to regulate Fleet's credit-card solicitations, plaintiff's claim was within the exception to the DTPA and the court affirmed summary judgment in favor of Fleet. *Id.* at 270 (applying *State v. Piedmont Funding Corp.,* 119 R.I. 695, 382 A.2d 819 (1978)).

This Court concurs with the reasoning and conclusions of the Third Circuit in *Roberts.* Because the OCC has the power to monitor Fleet's credit-card solicitations to ensure compliance with § 45(a), Fleet is not subject to liability under the DTPA for credit-card solicitations. *See Piedmont Funding Corp.,* 119 R.I. at 699, 382 A.2d at 822.

This Court is not persuaded by plaintiffs' argument that the OCC is powerless to regulate Fleet's credit-card solicitations under 15 U.S.C. § 45(a)(1). Citing 15 U.S.C. § 45(a)(2), plaintiffs contend that the prohibitions set forth in § 45(a)(1) do not apply to banks. Under 15 U.S.C. § 45(a)(2), "[t]he [FTC] is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions [and] * * * Federal credit unions * * * from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." The limiting provisions of 15 U.S.C. § 45(a)(2), however, expressly apply to the FTC's enforcement power. That section has no effect on the OCC's ability to prevent violations of 15 U.S.C. § 45(a)(1) as a consequence of its power to enforce any

"law, rule, or regulation" under 12 U.S.C. § 1818.

The plaintiffs further argue that the prohibitions of 15 U.S.C. § 45(a)(1) cannot be enforced against Fleet because the Board of Governors of the Federal Reserve System (Federal Reserve Board) has not issued regulations defining what acts or practices shall be deemed unfair or deceptive. Under 15 U.S.C. § 57a(f), the Federal Reserve Board is required to take steps to "prevent unfair or deceptive acts or practices in or affecting commerce" by issuing regulations "defining with specificity such unfair or deceptive acts or practices, and containing requirements prescribed for the purpose of preventing such acts or practices." The ability of the Federal Reserve Board to promulgate such regulations, however, does not eviscerate the OCC's authority to classify a particular act or practice as unfair or deceptive on a case-by-case basis.

In the absence of regulations specifically defining which acts or practices could be deemed unfair or deceptive under 15 U.S.C. § 45(a)(1), the OCC properly could make such a determination through informal adjudication. Congress did not provide strict guidance on what particular acts violate that section. Indeed, the phrase "unfair or deceptive acts or practices" does not easily lend itself to precise definition. Rather, "the meaning and application of [the phrase 'unfair or deceptive'] must be arrived at by the gradual process of inclusion and exclusion." *In the Matter of The American Bank of the South Merritt Island, Florida,* FDIC Enf. Dec. Lexis 512, FDIC–92–17b at 13 (November 24, 1992). The broad prohibitions outlined in 15 U.S.C. § 45(a)(1) leave room for interpretations by implementing agencies such as the OCC. The fact that Congress directed the Federal Reserve Board to enact corresponding regulations did not strip the OCC

of its power to adjudicate such issues and make appropriate determinations on a case-by-case basis. *See TeamBank, N.A. v. McClure,* 279 F.3d 614, 619 (8th Cir. 2002) (recognizing the OCC's power to fill gaps in a particular statute through informal adjudication).

Regulations promulgated by the Federal Reserve Board pursuant to 15 U.S.C. § 57a(f) merely serve to further identify deceptive acts or practices. The Federal Reserve Board's responsibility for issuing regulations pursuant to 15 U.S.C. § 57a(f) in no way curtails the OCC's broad enforcement power under 12 U.S.C. § 1818. Rather, regulations issued pursuant to 15 U.S.C. § 57a(f) would only increase the reach of the OCC's authority because they would constitute specific regulations that the OCC could enforce pursuant to 12 U.S.C. § 1818.

Next, plaintiffs argue that the OCC has no power to enforce the provisions of 15 U.S.C. § 45(a)(1) against Fleet in this case because even deceptive credit-card solicitations do not affect Fleet's financial stability, which is a requirement for the OCC to invoke its enforcement authority under 12 U.S.C. § 1818. *See First National Bank of Bellaire,* 697 F.2d at 681. The OCC has taken steps to stop such solicitations, thereby clearly evincing the OCC's position on the matter. The OCC has, on numerous occasions, initiated enforcement actions and entered consent orders with national banks whereby the bank agreed to cease certain credit-card solicitations. *See, e.g., In the matter of: net 1st National Bank Boca Raton, Florida,* OCC Enf. Dec., Lexis 93, OCC EA No. 2000-88 (issued September 25, 2000); *In the matter*

*of: Providian National Bank, Tilton, New Hampshire,* OCC Enf. Dec., Lexis 54, OCC EA No. 2000-53 (issued June 28, 2000).[8] The initiation of an informal enforcement proceeding that resulted in the consent order in those cases presumably was triggered by concerns that such credit-card solicitations could undermine the credibility of the banking institution, thereby triggering a wave of instability throughout the banking industry. Moreover, by monitoring national banks' credit-card solicitations to ensure that they are truthful and trustworthy, the OCC is able to take proactive steps to shield such banks from large-scale civil liability under various statutory and common law causes of action.

In addition, plaintiffs contend that summary judgment is inappropriate because controlling factual questions remain unresolved. Specifically, plaintiffs argue that the OCC's letter to AuCoin indicates that the OCC does not regulate credit-card solicitations. That letter noted that "many transactions that lead customers to complain about a bank's actions are not covered by federal laws and regulations within the OCC's jurisdiction." It went on to say that the OCC perceived no violation of "federal banking rules or regulations" on the part of Fleet. The customer assistance specialist who authored the letter implied that Fleet had not violated Regulation Z. That letter merely conveyed the customer service representative's opinion that Fleet acted in accordance with applicable rules and regulations. The letter did not address whether the OCC had the power to enforce the provisions of 15

---

**8.** Although "consent orders need not be supported by findings or opinion, they do express a good deal of the law of the agency." 2 Charles H. Koch, Jr. et al., *Administrative Law and Practice* § 5.43[2] (2d ed. 1997). Because practitioners pay considerable attention to consent orders, it has been "alleged that agencies intentionally make law through the consent process" by negotiating a "consent settlement with a small violator [to] establish a principle whereas a larger perpetrator might have fought the case * * *." *Id.*

U.S.C. § 45. Furthermore, in its amicus brief to this Court, the OCC implicitly has disavowed any statements in the letter that could be construed as an admission that the OCC has no power to enforce 15 U.S.C. § 45. In fact, the OCC specifically represents that it is endowed with such power through 12 U.S.C. § 1818.

The applicability of the exception to the DTPA in this case depends on a federal or state agency's legal power to regulate credit-card solicitations. The OCC's letter to AuCoin does not create a factual dispute affecting the OCC's legal authority to regulate such acts. The determination of whether the OCC is vested with such power is made solely by consulting applicable laws and regulations. Thus, the existence of that letter does not raise factual questions that could alter the outcome of this case.

The plaintiffs also argue that, even assuming that the OCC is empowered to enforce the provisions of 15 U.S.C. § 45, in that capacity the OCC would be acting as an enforcement body rather than a regulatory body for purposes of the exception to the DTPA. *See* § 6–13.1–4.[9] In presenting this argument, plaintiffs rely heavily on the Washington Supreme Court is interpretation of that state's analog to the DTPA, the Consumer Protection Act. Under the Revised Code of Washington, the Consumer Protection Act provides in pertinent part:

"Nothing in this chapter shall apply to actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of [Washington], the Washington utilities and transportation commission, the federal power commission or actions or transactions permitted by any other regulatory body or officer acting under statutory authority of [Washington] or the United States * * *." Wash. Rev.Code Ann. § 19.86.170 (West 1999)

Applying the *ejusdem generis* rule of statutory construction, which suggests that "specific words or terms modify and restrict the interpretation of general words or terms where both are used in sequence," the court held that the FTC was not a regulatory agency for purposes of the exception. *State v. Reader's Digest Association*, 81 Wash.2d 259, 501 P.2d 290, 303 (1972). Because all of the agencies referred to in § 19.86.170 regulated areas "where permission or registration is necessary to engage in an activity," and because the FTC had "no control over entry into its area of concern," the FTC did not constitute a regulatory body under § 19.86.170. *Reader's Digest Association*, 501 P.2d at 303, 304. Thus, the FTC's authority to monitor a business did not trigger the exemption of the Consumer Protection Act. *Id.* at 304.

The language contained in the exemption to the DTPA, however, provides a broader exemption than the one contained in the Washington counterpart. The only agency specifically referenced in § 6–13.1–4 is the Department of Business Regulation. Because the Department of Business Regulation is the only agency specifically referenced, there is no commonality between that agency and any other agency, as is the case in the Washington Act. Thus, to apply the rule of *ejusdem generis* to § 6–13.1–4 would be to limit the exemption

---

9. Fleet asserts that plaintiffs waived this argument by failing to raise the issue in Superior Court. *See Allstate Insurance Co. v. Lombardi*, 773 A.2d 864, 871 (R.I.2001). The plaintiffs, however, raised this issue in two places in their Superior Court memorandum in opposition to summary judgment. Thus, we will address the merits of this argument on appeal.

set forth in that section only to activities that are subject to regulation by the Department of Business Regulation itself. Furthermore, under *Piedmont* and its progeny, the applicability of the exception to the DTPA is predicated on an agency's ability to monitor a business's engagement in a specific activity. *Piedmont Funding Corp.*, 119 R.I. at 700, 382 A.2d at 822; *Perron*, 121 R.I. at 785, 403 A.2d at 254. Accordingly, because the OCC monitors and controls Fleet's credit card solicitations, the OCC is a "regulatory body" for purposes of the DTPA.

The plaintiffs also contend that the second motion justice applied a faulty analysis in granting summary judgment. According to plaintiffs, the second motion justice found Fleet's alleged activities to be exempt from the DTPA simply because Fleet was subject to general regulation by the OCC. The order granting summary judgment, however, clearly demonstrates otherwise. The order expressly provided that "the *specific conduct complained of* by plaintiff in this action is regulated and supervised by the [OCC]." (Emphasis added.) Thus, the second motion justice's reference to "the specific conduct complained of" makes it clear that he applied the second step of the analysis in *Piedmont Funding*. In addition, plaintiffs claim that the motion justice erroneously granted summary judgment as a result of his perceived need for a "singular approach to national banking regulation." That conclusion, however, did not contribute to the second motion justice's decision to grant summary judgment. Rather, he cited that need as grounds for departing from the law of the case doctrine.

■ Finally, plaintiffs aver that the second motion justice violated the law of the case doctrine by granting summary judgment on the DTPA claim. In granting Fleet's motion for summary judgment, the second motion justice reversed an earlier justice's rulings on the dispositive issue of the OCC's authority over Fleet's credit-card solicitations. The law of the case doctrine holds that, "after a judge has decided an interlocutory matter in a pending suit, a second judge, confronted at a later stage of the suit with the same question in the identical manner, should refrain from disturbing the first ruling." *Paolella v. Radiologic Leasing Associates*, 769 A.2d 596, 599 (R.I.2001) (quoting *Commercial Union Insurance Co. v. Pelchat*, 727 A.2d 676, 683 (R.I.1999)). The law of the case doctrine, however, is a flexible rule that may be disregarded when a subsequent ruling can be based on an expanded record. *Goodman v. Turner*, 512 A.2d 861, 864 (R.I.1986). Moreover, the doctrine should not be invoked to "perpetuate a clearly erroneous earlier ruling." *Paolella*, 769 A.2d at 599.

■ As discussed *supra*, this Court is of the opinion that the OCC is vested with regulatory authority over Fleet's credit-card solicitations, and any ruling to the contrary is clearly erroneous. Thus, the second motion justice's disregard for the earlier ruling to the contrary was not prohibited under the law of the case doctrine.

Although the law of the case doctrine does not mandate reversal of the judgment in this case,[10] Superior Court justices are admonished to consider the purpose of the doctrine before reversing an earlier ruling

10. Indeed, a motion justice's violation of the law of the case doctrine alone will constitute reversible error only in the rarest of situations. Because a motion justice may reverse an earlier ruling that is clearly erroneous, *Paolella v. Radiologic Leasing Associates,* 769 A.2d 596, 599 (R.I.2001), this Court will typically determine the propriety of both rulings. Given this Court's interest in judicial economy, it is difficult to conceive a situation in which the law of the case doctrine will require reversal of a subsequent correct ruling.

on the identical issue. The purpose of the law of the case doctrine is to ensure "the stability of decisions and avoid[ ] unseemly contests between judges that could result in a loss of public confidence in the judiciary." *Commercial Union Insurance Co.*, 727 A.2d at 683. Rather than reverse an earlier interlocutory ruling on a perplexing legal question that has been fully researched and argued, the Superior Court may certify the question to this Court pursuant to G.L.1956 § 9–24–27. *See In re Christopher S.*, 776 A.2d 1054, 1056 (R.I.2001). The second motion justice potentially undermined the public's confidence in the judiciary by reversing an earlier ruling that he expressly described as "well-reasoned and well-written." Thus, the purpose of the law of the case doctrine would have been better effectuated by certifying the DTPA question for appellate review by this Court. Although we consistently have frowned on certification without an adequate record, this is not such a case. *See State v. Carcieri*, 730 A.2d 11, 14 (R.I.1999) ("[W]hen we are faced with a certified question, unfortunately, 'we are deprived of the considerable benefit of a more complete record and of the trial justice's decision and its rationale prior to [appellate] review.' "). At the time the second motion justice granted summary judgment, there was an adequate record that would allow this Court to answer the purely legal question of whether the exception to the DTPA applied to Fleet's credit card solicitations.

### B

### Breach of Contract

Citing a lack of subject matter jurisdiction, the second motion justice granted

summary judgment in favor of Fleet on plaintiffs' breach of contract claim. The plaintiffs invoked § 8–2–13 to establish subject matter jurisdiction over both their DTPA and contract claims. Section 8–2–13 endows the Superior Court with subject matter jurisdiction over "suits and proceedings of an equitable character and to statutory proceedings following the course of equity." That section also provides the court with supplemental jurisdiction [11] over certain non-equitable claims. Specifically:

> "If an action is brought in the superior court which represents an attempt in good faith to invoke the jurisdiction conferred by this section, the superior court shall have jurisdiction of all other actions arising out of the same transaction or occurrence * * * and the court may retain jurisdiction over the other actions even though the initial action fails for want of equity jurisdiction." Section 8–2–13.

The plaintiffs assert that § 8–2–13 provides two bases for subject matter jurisdiction over their breach of contract claim. First, they argue that the court has jurisdiction because they, in good faith, sought equitable relief for that claim. Alternatively, they argue that § 8–2–13 provides the court with jurisdiction over their breach of contract claim because it arose out of the same "transaction or occurrence" that prompted them to request, in good faith, equitable relief under the DTPA.

■ At the outset, it is clear that the second motion justice erred in granting summary judgment on plaintiffs' breach of

---

11. Although § 8–2–13 does not specifically refer to "supplemental jurisdiction," it authorizes the court to extend jurisdiction over claims not falling within the original equity jurisdiction of the court under § 8–2–13.

Thus, § 8–2–13 is analogous to 28 U.S.C. § 1367, which authorizes federal district courts, in certain situations, to extend supplemental jurisdiction over claims not otherwise cognizable in federal court.

contract claim. Lack of subject matter jurisdiction over a particular claim is not appropriate grounds for granting summary judgment. Rather, the court's lack of subject matter jurisdiction "at most, should result in a dismissal on the action without prejudice." *Nichola v. Fiat Motor Co.,* 463 A.2d 511, 513 & n. 3 (R.I.1983). Accordingly, the trial justice erred by granting summary judgment on plaintiffs' breach of contract claim on that ground. Fleet concedes this point.

 We perceive two additional errors in the second motion justice's termination of plaintiffs' breach of contract claim. First, we are of the opinion that the breach of contract claim was "of an equitable character" and, consequently, the Superior Court had jurisdiction over that claim. Section 8–2–13. The determination of whether to grant or deny equitable relief is within the discretion of the motion justice. *Ruggieri v. City of East Providence,* 593 A.2d 55, 57 (R.I.1991). In making that determination, the motion justice "should be guided by 'basic principles of equity and justice.'" *Id.* "This involves balancing the equities, weighing the hardships to either side, and examining the practicality of imposing the desired relief. In addition, the complaining party must show that any legal remedy would be inadequate." *R.I. Turnpike & Bridge Authority v. Cohen,* 433 A.2d 179, 182 (R.I.1981). This Court will not disturb a motion justice's denial of equitable relief absent an abuse of discretion. *Citrone v. SNJ Associates,* 682 A.2d 92, 95 (R.I.1996). Based on the record as it existed when the second motion justice granted summary judgment, it is apparent that he erred by categorically refusing to grant equitable relief

in the event plaintiffs succeeded on their breach of contract claim.

 If plaintiffs successfully established that Fleet routinely breached contracts with its credit-card holders, then injunctive relief would be apposite. According to plaintiffs, Fleet had engaged in and continues to engage in widespread misdealing with large groups of individuals. At least one of the named plaintiffs, and undoubtedly thousands of other people, maintain credit-card accounts with Fleet. If it were determined that Fleet continued to charge interest rates in contravention of their contracts, equity would counsel in favor of the issuance of an injunction to allow credit-card holders to enjoy the benefit of their bargain with Fleet. The plaintiffs concede their actual damages were minimal. Thus, assuming the other class members [12] were similarly situated, equity would justify the issuance of an injunction to prevent each individual class member from having to endure costly litigation to recover relatively minor financial recompense.

Additionally, in determining that equitable relief was an inappropriate remedy, the second motion justice did not present any reasons for his conclusion. Rather, he merely stated that "this is not a proper case for equitable relief." By giving such short shrift to the equitable issues in the case, it is apparent the motion justice did not adequately consider the "'basic principles of equity and justice.'" *Ruggieri,* 593 A.2d at 57.

 Even if equitable relief were unavailable to the plaintiffs for their breach of contract claim, § 8–2–13 does not necessitate dismissal of that claim. Pursuant to the supplemental jurisdiction provision of

---

**12.** Because we review this evidence in the light most favorable to plaintiffs, to the extent that it relates to our decision, we treat this case as though it were certified as a class action.

§ 8–2–13 "the court *may* retain jurisdiction over [non-equitable] actions even though the initial action fails for want of equity jurisdiction." (Emphasis added.) In this case, the second motion justice granted summary judgment after concluding that "equity jurisdiction does not exist." So doing, however, he erred by failing to consider the possibility of retaining supplemental jurisdiction over the plaintiffs' breach of contract claim.

## Conclusion

For the reasons stated herein, we affirm in part and reverse in part the judgment of the Superior Court. The record shall be remanded to the Superior Court for further proceedings on the plaintiffs' breach of contract claim.

FLANDERS, Justice, dissenting.

I respectfully dissent. I would join the high courts of Massachusetts, Connecticut, and the majority of such courts in other states that have refused to exempt national banks from their state's unfair and deceptive trade practices act and hold that G.L.1956 § 6–13.1–4 [13] does not exempt the defendant national bank's credit-card activity in Rhode Island from this state's deceptive trade practices act (DTPA). I would also hold that the second motion justice violated the law-of-the-case doctrine when he decided to rule, again, on the same legal question that the first motion justice had decided when she concluded that the DTPA exemption did not apply to the credit-card activity at issue in this case.

## I

### The Challenged Actions Were Not Permitted Under Laws Administered by Any State or by Any Federal Regulatory Body or Officer

Neither the Office of the Comptroller of the Currency (OCC) nor any other regulatory agency permits or regulates the activity in question (the issuing and marketing of credit cards). Although the OCC contends that it has the power to review national banks' alleged unfair and deceptive credit-card activity on an ad-hoc basis to determine whether to initiate the enforcement of any alleged violation of law, such episodic, ad-hoc enforcement, under a questionable grant of authority to do so, does not constitute the kind of permissive regulation and continuing monitoring of an activity that is necessary to qualify for the statutory exemption under DTPA. If it were otherwise, then the ability of the state attorney general, who unquestionably is empowered to exercise ad-hoc review and institute enforcement of DTPA with respect to alleged deceptive conduct by banks and other businesses, would immunize *all* businesses from the reach of DTPA. If the mere power of a regulatory entity or official (for example, the OCC or the attorney general) to initiate enforcement activity with respect to the challenged conduct were enough to trigger the exemption, then the exemption would swallow the statute and render it virtually unenforceable by private parties—despite the General Assembly's express creation of a private cause of action for DTPA violations. Such a result is not only illogical but absurd given the Legislature's express

---

**13.** General Laws 1956 § 6–13.1–4 provides as follows:

"**Exemptions.**—Nothing in this chapter shall apply to actions or transactions permitted under laws administered by the de-partment of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States."

creation of a private cause of action for DTPA violations.

Although the Third Circuit has held in *Roberts v. Fleet Bank (R.I.)*, 342 F.3d 260, 270 (3d Cir.2003) that section 8(b)(1) of the Federal Deposit Insurance Act (FDIA)—codified at 12 U.S.C. § 1818(b)(1)—authorizes the OCC to initiate enforcement activity with respect to national banks' alleged unfair and deceptive acts, national banks do not have to register with the OCC or to obtain its permission before they can issue or market credit cards. Thus, whatever review OCC may undertake of national banks' credit-card activities is strictly to decide whether to initiate enforcement actions and not to monitor or regulate their compliance with any federal authorization to engage in such activity. Moreover, the Third Circuit has previously restricted 12 U.S.C. § 1818(b)(1)'s grant of authority to situations that threaten the financial stability of the bank in question. *See, e.g.,* *National State Bank v. Long*, 630 F.2d 981, 988 (3d Cir.1980) (holding that 12 U.S.C. 1818(b)(1) is applicable to a violation of state law that directly implicates concerns in the banking field). Thus, given that the OCC does not authorize and monitor the credit-card activity of national banks as a regulator and given the murky scope of any authority it might have to initiate enforcement actions against illegal credit-card activity by national banks, we should not exempt this defendant from DTPA.

In *State v. Piedmont Funding Corp.*, 119 R.I. 695, 699, 382 A.2d 819, 822 (1978), this Court construed the DTPA exemption as applying in situations in which the general activities of a business entity—in that case, selling insurance and securities—"were approved by various governmental agencies and regulatory bodies." Thus, in *Piedmont* the activity in question (selling insurance and mutual funds) could not oc-

cur until and unless the entity in question first obtained permission from and registered with the appropriate regulatory agency. *Id.* Thereafter, that entity was "subject to monitoring and regulation by the appropriate regulatory agency or officer." *Id.* at 700, 382 A.2d at 822. Under these circumstances, the Court held that the general activity in question was regulated and it applied the DTPA exemption to that activity when the plaintiff was unable to show that the regulation in question did not cover the specific challenged acts of the regulated entity. *Id.*

To determine whether the DTPA exemption would apply to future alleged DTPA violations, this Court announced a two-part test. *Id.* First, the party claiming the exemption must initially show that a "regulatory body or officer" regulates the general activity at issue, as in the *Piedmont* case, and then the opposing party must show that the regulation does not cover the specific acts in question. *Id.* Here, although defendant has introduced evidence that federal agencies such as the OCC generally review various activities of national banks, it has not shown that the OCC or any other agency or official regulates their specific activity of issuing and marketing credit cards. Indeed, it appears that no agency specifically approves or grants permission for banks to issue credit cards or to engage in related marketing activity. Nor is this a situation, as in *Piedmont*, in which a bank's failure to comply with applicable rules and regulations relating to credit-card activity can result in a regulatory agency's withdrawal of its license, registration, or permission to do so. Indeed, no such license, registration, or permission is required by federal authorities before banks can issue and market credit cards.

Nevertheless, it is certainly true that national banks are federal instrumentali-

ties that are subject to OCC enforcement actions. *See Michie on Banks and Banking,* ch. 15, § 6 (1999). For example, under 12 U.S.C. § 1818(b)(1) of the FDIA, the OCC can issue cease-and-desist orders when a national bank engages in an "unsafe or unsound" practice, or violates a law, rule or regulation. 12 U.S.C. § 1818(b)(1). *E.g., Branch v. FDIC.,* 825 F.Supp. 384, 391 (D.Mass.1993). When a cease-and-desist order is premised on an unsafe or unsound banking practice, however, the OCC's enforcement authority is limited to acts directly affecting the bank's financial stability. *See First National Bank of Bellaire v. Comptroller of Currency,* 697 F.2d 674, 681 (5th Cir.1983); *see also Gulf Federal Savings and Loan Association v. Federal Home Loan Bank Board,* 651 F.2d 259, 264, 267 (5th Cir. 1981) (interpreting cease-and-desist authority of former FHLLB over federally chartered thrifts). But when the order is based on an asserted violation of a law, rule, or regulation, the alleged violation need not threaten the banks financial soundness for the OCC to properly exercise its authority under 12 U.S.C. 1818(b)(1). Arthur E. Wilmarth, Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System,* 58 Fordham L.Rev. 1133, 1205 (1990). *But see First National Bank of Bellaire,* 697 F.2d at 681 (citing *Gulf Federal Savings and Loan Association,* 651 F.2d at 264, 265 n. 5). And the OCCs power to enforce 5 of the Federal Trade Commission Act against national banks is questionable at best, given the absence of any specific regulations or laws promulgated by the Federal Reserve Board concerning the alleged bait-and-switch tactics used to market credit cards that are at issue here. *See* 15 U.S.C. 57a(f)(1) (empowering the board to prescribe regulations defining unfair and deceptive bank practices).

Thus, as the first motion justice concluded, 12 U.S.C. 1818(b)(1) does not grant the OCC free reign to enforce any violation of law. Instead, the OCC may not be able to act until the Federal Reserve Board has promulgated a specific regulation pertaining to national banks or only when the purpose of the underlying regulation is to further the financial stability of the banking institution. The Fifth Circuit has interpreted 12 U.S.C. 1818(b)(1) more narrowly than its sister circuits, requiring that the alleged violation must actually threaten the banks financial soundness. *See First National Bank of Bellaire,* 697 F.2d at 681 (12 U.S.C. 1818(b) applies only to violations of law "with a reasonably direct effect on a banks financial stability").

In any event, most state courts, when interpreting similar consumer-protection statutes such as DTPA, have declined to exempt national banks' from their reach, despite the existence of the federal regulatory regime. In *Normand Josef Enterprises, Inc. v. Connecticut National Bank,* 230 Conn. 486, 646 A.2d 1289, 1306 (1994), the Supreme Court of Connecticut held that its consumer-protection statute applied to national banks allegedly unfair and deceptive acts. Like DTPA, the Connecticut statute exempted "[t]ransactions or actions otherwise permitted under law as administered by any regulatory board or officer acting under statutory authority of the state or the United States." Conn. Gen. Stat. Ann. 42–110c(a) (2003). While noting the extensive federal scheme for regulating banks, the Connecticut high court held that the "mere existence of generic state and federal banking regulations does not exclude [Connecticut's consumer protection act] coverage." *Normand,* 646 A.2d at 1305. The court also noted the bank's specific challenged conduct was not regulated at all: [W]e have

been unable to find any statute or regulation that regulates a bank's duties with regard to its right to setoff an account when dealing with others, such as garnishers, who have a direct adverse interest in that same account. *Id.*

By declining to grant banks a blanket exemption from that state's consumer-protection statute, the Connecticut Supreme Court aligned itself with the Massachusetts Supreme Judicial Court. In *Raymer v. Bay State National Bank*, 384 Mass. 310, 424 N.E.2d 515, 521 (1981), the Massachusetts high court noted that although banks are regulated by federal agencies, they are not exempt from the Massachusetts consumer-protection act, which contains exemption language almost identical to DTPA. Mass. Gen. Laws ch. 93A, 3 (2002). Similarly, the Supreme Court of New Mexico held, in *Ashlock v. Sunwest Bank of Roswell, N.A.*, 107 N.M. 100, 753 P.2d 346, 349 (1988), that its consumer-protection statute, which contained exemption language similar to DTPA, did not exempt banks from its application. In so holding, the court reasoned that its "attention ha[d] not been directed to any federal statute or regulation that would evidence the intention of Congress or the federal regulatory branch to regulate, to any extent, the bank's failure to deliver goods or services as promised." *Id.*

Indeed, "most state courts have determined that banks are subject to the provisions of their state's unfair or deceptive trade practices or consumer protection statutes." *Normand Josef Enterprises, Inc.*, 646 A.2d at 1306 (collecting cases). Generally, the few courts that have held otherwise have predicated their decisions on consumer-protection statutes that, unlike DTPA, either explicitly exempted banks or incorporated the Federal Trade Commission Acts exemption for banks. *Id.* Of all the cases cited by the Connecti-

cut Supreme Court, only two have held that their consumer protection act's did not apply to banks because "banks were sufficiently and pervasively regulated by other regulatory agencies." *Id.*

Here, the evidence showed that neither the OCC nor any other federal agency permits, licenses, regulates, or monitors defendants specific act of issuing and marketing credit cards, whether in Rhode Island or elsewhere. *See Perron v. Treasurer of Woonsocket*, 121 R.I. 781, 786, 403 A.2d 252, 255 (1979) (holding that although a public utility is generally regulated by the Public Utilities Commission, the utility's hookup agreement with the city was not regulated). Although, following *Piedmont*, we have interpreted the DTPA exemption as applying to "all activities and businesses that are subject to monitoring by state and federal regulatory bodies or officers," *Kelley v. Cowesett Hills Associates*, 768 A.2d 425, 432 (R.I.2001) (per curiam); *see also Piedmont Funding Corp.*, 119 R.I. at 699, 382 A.2d at 822, we have done so only in the context of a business that, as in *Piedmont*, had to obtain a regulatory agency's permission to engage in the activity at issue. Thus, we have never held that the exemption applies to activities that are reviewed, if at all, only for mere enforcement purposes on an ad-hoc and episodic basis.

Rather than pervasively monitoring and regulating the bank's alleged unfair and deceptive practices with respect to credit-card activity, the OCC attempts to enforce alleged violations of federal banking law only on a case-by-case basis. Significantly, it does not permit, approve of, or license banks' credit-card activities, as was true for the regulated activities in the *Piedmont* case, and banks do not have to register with the OCC, obtain its approval, or become licensed before issuing or marketing credit cards, as was the case for the

activities at issue in *Piedmont*. Thus, we should hold that because no regulatory agency permits the activity at issue, the DTPA exemption does not apply to defendant's challenged conduct.

In addition, federal circuit courts have inconsistently interpreted 12 U.S.C. § 1818(b)(1) of the FDIA, which purportedly authorizes the OCC to enforce any violation of law, including banks' allegedly unfair or deceptive acts. Although it is not this Courts province to determine which interpretation of 12 U.S.C. 1818(b)(1) is correct, the ambiguity and conflicting federal court opinions concerning the scope of the OCCs enforcement authority also militate against exempting national banks from DTPA.

In this case, the majority relies heavily on *Roberts*, 342 F.3d at 270, a recent Third Circuit decision holding that "the OCC's authority to bring enforcement actions against national banks for violations of laws or regulations" empowers the OCC "to regulate false and misleading advertising proscribed under Section 5 of the FTC [Federal Trade Commission] Act."

Despite the *Roberts* court's reliance on the facial language of 12 U.S.C. § 1818(b)(1), the Third Circuit previously suggested that the OCC may issue a cease-and-desist order pursuant to a violation of law *only* when the purpose of the law is to further the financial stability of the banking institution or when the law directly implicates concerns in the banking field.

*See National State Bank*, 630 F.2d at 988.[14] This view is followed by the Ninth Circuit in *Saratoga Savings and Loan Association v. Federal Home Loan Bank Board*, 879 F.2d 689, 693 (9th Cir.1989), and the Fifth Circuit, which has adopted an even more restrictive interpretation, ruling that the alleged violation of law must actually threaten the banks financial soundness. *First National Bank of Bellaire*, 697 F.2d at 681.

Here, the purpose of DTPA is to protect consumers, not to buttress the financial stability of banks. Moreover, no one has suggested that defendants alleged violation of DTPA has threatened its financial soundness. Finally, defendants alleged violation of DTPA does not directly implicate federal regulatory concerns in the banking field, especially when the OCC has declined to take any enforcement action against defendants challenged conduct, despite numerous complaints about its alleged bait-and-switch activities in the marketing of its credit cards.

In conclusion, plaintiff has demonstrated that we should not exempt this national bank from DTPA because its involvement in the issuing and marketing of credit cards to consumers, such as this plaintiff, was not generally or specifically regulated or monitored for unfair and deceptive practices. Instead of granting permission for and thereafter monitoring national banks credit-card activities for unfair and deceptive acts in a manner consistent with

---

**14.** Specifically, the Third Circuit stated:

"[Section 1818(b)(1)] provides that the appropriate federal banking agency may initiate cease and desist proceedings against any insured bank that violates *'a law.'* 12 U.S.C. 1818(b)(1). The legislative history of the Act indicates that Congress was concerned not only with federal but with state law as well, particularly as it might bear on corruption of bank officials *or the financial stability of the institution.*

It may be that the word 'law' as used in the statute is not all encompassing and may exclude matters of purely local concern. However, when state law prohibits the practice of redlining, its enforcement so *directly implicates concerns in the banking field* that the appropriate federal regulatory agency has jurisdiction." *National State Bank v. Long*, 630 F.2d 981, 988 (3d Cir. 1980). (Emphases added.)

*Piedmont* and the statutory language of the exemption in question, the OCC reviews these acts, if at all, only on an ad-hoc basis to determine whether to initiate enforcement activity. In addition, federal circuit courts have inconsistently interpreted the breadth of the enforcement authority granted to OCC by 12 U.S.C. 1818(b)(1), rendering uncertain its ability to enforce bank actions that allegedly violate DTPA. Therefore, we should not exempt this national banks credit-card activity from DTPA.

## II

**The Law of the Case Doctrine Barred the Second Motion Justice from Ruling on This Issue for a Second Time in the Same Case**

I fear that the majority's decision in this case effectively sounds the death knell for the law-of-the-case doctrine in Rhode Island. From now on, whenever any party disagrees with a decision by a first motion-calendar justice, that party should simply wait for a new justice to preside over that calendar or to take charge of the case and then refile the motion. If the other side objects on law-of-the-case grounds, simply cite this case and point out that the law of the case is no longer an obstacle to reversing the previous ruling.

Before the Court's decision in this case, the law of the case doctrine stood for the proposition that "after one judge has decided an interlocutory matter in a pending suit, a second judge on that same court, when confronted at a later stage of the suit with the same question in the identical manner, should refrain from disturbing the first ruling." *Richardson v. Smith,* 691 A.2d 543, 546 (R.I.1997). In *Forte Brothers, Inc. v. State of Rhode Island Department of Transportation,* 541 A.2d 1194, 1196 (R.I.1988), we stated that "a decision made by one judge of coordinate jurisdic-

tion should not, in the absence of special circumstances, be set aside by another justice passing upon the identical question in the same case." *Accord North American Planning Corp. v. Guido,* 110 R.I. 22, 24–25, 289 A.2d 423, 425 (1972) (a decision "once made by a justice of a trial court, should not again be reviewed by another justice of the same court absent the most compelling and exceptional circumstances"). In the second motion justice's decision on February 25, 2002, he stated that the special circumstance in this lawsuit that justified a departure from the law of the case was the "need for national banking policies and a clear, singular approach to national banking regulation." Under our case law, however, such a belief did not constitute the compelling and exceptional circumstances that would warrant one Superior Court justice overturning the decision of another Superior Court justice.

To be sure, in *Paolella v. Radiologic Leasing Associates,* 769 A.2d 596, 599 (R.I. 2001) (per curiam), we noted that a trial justice may properly depart from the law-of-the-case doctrine when the earlier ruling is "clearly erroneous." *Accord Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (stating law-of-the-case doctrine does not apply when the "initial decision was 'clearly erroneous and would work a manifest injustice'"); *In re Estate of Speight,* 739 A.2d 229, 231 (R.I. 1999) (per curiam) (noting law-of-the-case doctrine "should not be used to perpetuate clear error in an earlier erroneous ruling"). But here, the first motion justice's learned, well-reasoned, and extensively researched decision, which cited numerous authorities and relied on the conclusions reached by a majority of our sister states when they considered the scope of their analogous or identical DTPA exemptions, was not

"clearly erroneous" by any stretch of the imagination. Thus, in my judgment, when the second motion justice granted summary judgment in favor of defendants, he flouted the law-of-the-case doctrine in doing so because he should have respected that another Superior Court justice already had ruled on this same legal issue and that nothing had changed since that first ruling that would have allowed him to revisit the question.

Moreover, the second motion justice's disagreement with the reasoning of the first motion justice or his perception that national banks require a "singular approach to national banking regulation" were hardly "compelling and exceptional" circumstances justifying his reconsideration of the legal issues that the first motion justice already had ruled on. Otherwise, whenever a second motion justice can be persuaded that the first motion justice got it wrong, then he or she will conclude that they have a free hand to reverse the first motion justices ruling. Even the majority acknowledges that the second motion justice "potentially undermined the publics confidence in the judiciary by reversing an earlier ruling that he expressly described as 'well-reasoned and well-written.' "

But the majority's suggested cure for the problem of allowing Superior Court justices to reverse the previous rulings of their colleagues—"the Superior Court may certify the question to this Court pursuant to G.L.1956 § 9–24–27"—is worse than the disease. Now, after this decision, Superior Court justices, instead of respecting the law of the case, will simply boot the case upstairs to this Court as a certified question, citing the majority's decision as authority to do so. Thus, instead of having legal questions settled in any given case, unless and until a party appeals from a final judgment, this new protocol will engender numerous attempts to certify inter-

locutory questions of law to us whenever a trial or motion justice thinks one of his or her colleagues may have reached the wrong legal conclusions in any pretrial ruling.

Moreover, such a certification option flies in the face of what this Court has said about the limited circumstances under which certification is proper. Until now, we have

> " 'consistently and repeatedly mandated that a trial or hearing justice should not certify a question of law to [the Supreme] Court unless and until he or she first carefully considers the question or questions sought to be certified and then, after having had the benefit of counsels' research and informed arguments, believes that he or she is unable to resolve the question satisfactorily.' " *Pierce v. Pierce,* 770 A.2d 867, 870 (R.I. 2001).

In deciding to depart from the law-of-the-case doctrine, the second motion justice referenced his earlier decision in a different case (*Rossman v. Fleet*), in which he arrived at a result contrary to the first motion justice's decision in this case. A contrary decision by a Superior Court justice in another case, however, is not a sufficient basis for departing from the law-of-the-case doctrine. In *Forte Brothers, Inc.,* 541 A.2d at 1196, we declined "to provide a rule of *stare decisis* regarding decisions of trial courts as having binding effects upon other members of the same or coordinate trial courts." We further explained that "only the decisions of this [C]ourt are of binding effect upon all justices of trial courts of this state." *Id.* The second motion justice, therefore, improperly took it upon himself to resolve the split in the Superior Court decisions on this subject by departing from the law-of-the-case doctrine and overturning the earlier

decision of a different justice in the same case that denied Fleet's motion to dismiss.

Because the *Rossman* decision was not binding on the second motion justice, because the law of the case prevented him from revisiting the first motion justice's decision in these circumstances, and because I believe he erred as a matter of law in how he interpreted the DTPA exemption, I would reverse, vacate the summary judgment in favor of the defendant, and remand this case for trial.